633 So.2d 735 (1994)
RIVNOR PROPERTIES, a Louisiana Partnership,
v.
HERBERT O'DONNELL, INC., et al.
No. 92-CA-1103.
Court of Appeal of Louisiana, Fifth Circuit.
January 12, 1994.
Rehearing Denied April 18, 1994.
*738 Warren A. Goldstein, David Robinson, New Orleans, for plaintiffs-appellants Riverside Life Ins. Co., Rivnor Properties and Northwestern Mut. Life Ins. Co., individually and in their capacities as assignees of (1) Herbert O'Donnell, Inc. and its insurers, Maryland Cas. Co., American Gen. Corp. and Republic Ins. Co., and (2) George A. Saunders and his insurer, Continental Cas. Co.
Henri Wolbrette, Arthur H. Leith, McGlinchey Stafford Lang, New Orleans, for defendant-appellant Belou & Co. Acoustics, Inc.
John A. Stewart, Jr., Hulse, Nelson & Wanek, New Orleans, for defendants-appellants George A. Saunders and Continental Cas. Co.
Craig J. Cimo, Gretna, for defendant-appellant Parish of Jefferson.
Gerard T. Gelpi, C. Gordon Starling, Jr., James D. Bercaw, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, for defendant-appellee Republic Ins. Co.
Samuel M. Rosamond, III, Edward A. Rodrigue, Jr., Boggs, Loehn & Rodrigue, New Orleans, for defendant-appellee Ceco Corp.
Stephen K. Conroy, Metairie, for defendant-appellee Howmet Aluminum Corp. and Royal Ins. Co.
Leon A. Crist, Metairie, for defendant-appellee Republic Roofing Co.
David F. Bienvenu, Renee Summer Melchiode, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for defendant-appellee Maryland Cas. Co.
Bernard J. Williams, Duplass, Witman, Zwain & Williams, Metairie, for defendant-appellee Aetna Cas. & Sur. Co.
Before KLIEBERT, GAUDIN and DUFRESNE, JJ.
KLIEBERT, Chief Judge.
This appeal resulted from multi-party litigation surrounding the alleged defective design and construction of a three-story office building in Metairie, Louisiana. Following a lengthy bench trial, the trial court rendered judgment finding numerous defects in the building; assessing liability among the general contractor, architect, and numerous subcontractors; and setting monetary damages suffered by the building owner at $1,994,946.00.[1] Additionally, the trial court rendered judgment concerning the interpretation of a number of insurance policy provisions.[2] For the following reasons, we reverse in part, modify, and, as modified, affirm.

STATEMENT OF THE CASE
In April 1981 Riverside Life Insurance Company (hereafter Riverside), as owner, and Herbert O'Donnell, Inc. (hereafter O'Donnell), as contractor, entered into an agreement for the design and construction of a three-story office building in Metairie, Louisiana (hereafter Honeywell Building). The contract provided for O'Donnell to construct the building for a specified price. The Honeywell Building was substantially complete *739 in September 1981. Thereafter, on December 22, 1982, Riverside and Northwestern Mutual Life Insurance Company (hereafter Northwestern) formed a partnership, i.e., Rivnor Properties. The partnership purchased the Honeywell Building. Subsequently, Riverside sold its interest in the partnership to Northwestern. Hereinafter the term "owners" or "Rivnor" refers collectively to Rivnor, Riverside, and/or Northwestern.
In addition to the contract between Riverside and O'Donnell, O'Donnell contracted with the architect, George A. Saunders (hereinafter Saunders), for plans and specifications at a fixed price, with no contractual supervisory obligations incident to construction. O'Donnell also contracted directly with several subcontractors, who in turn, contracted with subcontractors and/or manufacturers or suppliers. There was no contract between the owners of the building and Saunders, any subcontractors, or suppliers/manufacturers.
Shortly before completion of the building and for some protracted period thereafter, the original owner, Riverside and the subsequent owners of the Honeywell Building complained to O'Donnell and Brandt Glass Company, Inc. (I. Brandt & Sons, Inc.) (hereinafter Brandt), the installer of the exterior curtain wall system of the Honeywell Building, about water leaks into the building. Over a period of approximately three years O'Donnell responded to the owners' complaints by referring the complaints primarily to Brandt, and also to Saunders (who, in turn, communicated with Howmet, the designer and fabricator of the curtain wall system) and to some of the other subcontractors. Brandt and Republic Roofing Company, Inc. (hereinafter Republic Roofing) did some patch work on the cap flashing, drilled holes in the curtain wall, and installed caulking around the building in an effort to stop the leaking. With the passage of time, the owners also complained of excessive glass breakage and discoloration, a cosmetic problem (discoloration) which occurred just below the Honeywell sign on the building.
Finding the remedial efforts unsuccessful in stopping the water leakage, the owner hired its own testing companies, and subsequently hired Ladd P. Ehlinger and Associates (Ehlinger) to determine the cause and extent of the water leakage problem in the building and to recommend methods of correcting same. Ehlinger proceeded to make an in depth examination of the causes of the water leakage into the building. During the investigation he found, in his opinion, numerous defects, and recommended solutions to remedy the alleged defects. The owners proceeded to perform the work recommended by Ehlinger.
As a result of the lack of success in the attempted repairs of the building, Rivnor filed suit in April 1985 against O'Donnell for breach of contract and express and implied warranties, praying for damages covering the cost of repairs and diminution of value of the building. O'Donnell, in turn third partied Saunders, Brandt, Republic Roofing and Howmet. Thereafter, other subcontractors, suppliers and their sureties and insurers were added as parties. In general, as other parties were brought into the litigation Rivnor amended its petition to name these parties as defendants.
The Rivnor-initiated litigation spurned claims and cross-claims against the sureties, additional subcontractors, and between claimants and/or the insureds against their insurers. Additionally, Saunders made the Parish of Jefferson a party defendant contending the Parish of Jefferson failed to comply with the duties and obligations undertaken when it passed zoning ordinances and building codes and issued building permits. In turn, the Parish reconvened against Saunders. Mechanical Construction Company of New Orleans sued its air-conditioning consulting engineer. Finally, Republic Insurance Company sued Maryland Casualty seeking contribution for a portion of the settlement reached between their insureds, and the plaintiffs-O'Donnell.
During the course of a trial covering a period of approximately one year and prior to the issuance of the trial court's judgments, the owners (Riverside, Rivnor and Northwestern) settled their differences with O'Donnell and its insurer, Maryland Casualty, and Saunders and its insurer, Continental Casualty Company, in separate agreements.
*740 These settlement agreements provided for the full reservation of the owners' rights against the non-settling defendants, and for the assignment of all other claims of O'Donnell, and Saunders, and their insurers against all other non-settling defendants. The settlement with Saunders specifically reserved Rivnor's right to contest the Continental policy provisions regarding the reduction of the policy limits for attorney's fees and expert fees incurred by Continental in defending the claims asserted against Saunders.
At the conclusion of a lengthy trial, the trial judge rendered judgment on February 8, 1990 finding:
1. O'Donnell, the general contractor, liable to the owner, for all of Rivnor's damages, losses, expenses and costs, as itemized in the judgment, for a total amount of $1,994,946.00.
2. As between O'Donnell, Saunders, and the subcontractors, the trial court found the following parties were liable to O'Donnell for the following percentages of the owners' damages, losses and expenses:
a. Saunders, Architect 25%
b. Brandt Glass, Subcontractor who furnished and installed the exterior curtain wall system (manufactured by Howmet) and the glass (manufactured by PPG) 35%
c. Belou and Company Acoustics, Inc., the dry wall contractor who also installed metal stud walls behind the exterior curtain wall system at the east and west ends of the Building 25%
and absolved the following subcontractors or designers of liability:
a. Howmet Aluminum Corporation, supplier who designed, manufactured and furnished to Brandt the patented curtain wall system used in the building;
b. Republic Roofing Company, the roofer who had installed a portion of the cap flashing;
c. Mechanical Construction of New Orleans, Inc., the installer of the air conditioning system.
The total damages awarded to the owners by the trial court amounted to $1,994,946.00 and was computed as follows:

 Repairs to Honeywell Building (including costs of
 tests to determine deficiencies) $1,200,000.00
 Architect Fees 200,000.00
 Attorney Fees 200,000.00
 Expert Fees 14,500.00
 Loss Rental Income Past $165,866.00
 1989 82,933.00
 1990 41,647.00
 Rental Income rebated to
 Honeywell (prime tenant) 90,000.00
 ___________
 $380,446.00 380,446.00
 _____________
 TOTAL $1,994,946.00

Interest was awarded from the date of judgment.
Under date of February 8, 1990, the trial court decreed judgments:
I. On the main demand as follows:
1. In favor of Northwestern Mutual Life Insurance Company,[3] owner, and against Brandt Glass ($698,231.10);

*741 2. In favor of Northwestern Mutual Life Insurance Company, owner, and against Belou & Company Acoustics, Inc. ($498,766.50);
3. In favor of Defendants and Third Party DefendantsHowmet Aluminum Corporation, Mechanical Contractors, Inc., and Republic Roofing Company, Inc. and against Plaintiffs, Rivnor Properties, Inc., Riverside Life Insurance Company and Northwestern Mutual Life Insurance Company, and all Third Party Plaintiffsdismissing all claims;
4. All Third Party claims of Brandt Glass Co., Inc. and Belou & Company Acoustics, Inc. are dismissed.
II. On claims spurned by the main demand as follows:
a. In favor of Aetna & against Brandt Glass Company, Inc. recognizing the work product exclusion in the Aetna Insurance policy and dismissing Aetna.
b. In favor of Maryland Casualty Company and against Republic Insurance Company dismissing Republic's claim for additional contribution in respect to primary underlying coverage.
c. In favor of Continental Casualty Company and against Plaintiffs, Riverside Life Insurance Company, Rivnor Properties, a Louisiana Partnership and Northwestern Mutual Life Insurance Company, dismissing plaintiff's claims for any sums in addition to the settlement between plaintiff and Continental Casualty Company.
Subsequently, following a hearing on a new trial motion filed by Rivnor, Belou and Insurance Company of North America, (INA) the trial court concluded it did not intend to dispose of any claims against INA and by judgment dated April 11, 1990 sought to amend the February 8, 1990 judgment. Also, by AMENDMENT TO JUDGMENT dated April 25, 1990, the trial court sought to amend the February 8, 1990 judgment insofar as it dismissed all third party claims of Belou & Company Acoustics, Inc. as follows:
"To preserve the entirety of the Third-Party Demand made herein by Belou & Company Acoustics, Inc. and against the Insurance Company of North America."
Subsequently, Belou and INA settled, under the terms of which INA agreed to indemnify Belou against any judgment rendered against it up to a principal sum of $2.1 million, plus interest, costs and attorney's fees.
The trial court, by judgment dated April 30, 1990, vacated the April 11, 1990 judgment and amended the judgment dated February 8, 1990 deleting the decretal portion itemized as "4" above and, in lieu thereof, added the following decree:
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all third party claims of Brandt Glass Company, Inc. [I. Brandt & Sons, Inc.] and all third party claims of Belou and Company Acoustics, Inc. (except for its third party claims against Insurance Company of North America and Harbor Insurance Company) be and the same are hereby dismissed at their respective costs."
The above judgments were appealed by the following parties:
1) Rivnor, individually and as assignee of
a) O'Donnell and its insurer, Maryland Casualty Co.; and
b) Saunders & its insurer, Continental Casualty Co.;
2) Belou & Company Acoustics; and
3) Republic Insurance Company.
The following parties have also appealed the judgments as specified. Continental Casualty Company appeals the judgments granting CECO Corporation's motions for involuntary dismissal dated November 29, 1988 and the motion granting the Parish of Jefferson's motion for involuntary dismissal dated November 28, 1988. Belou and its insurer, the Insurance Company of North America (INA) appealed the granting of CECO's motion for involuntary dismissal by judgment signed March 20, 1989. This judgment also dismissed the claims of Brandt Glass and its insurer, Aetna, but Brandt/Aetna have not appealed therefrom. Rivnor also appeals the granting of CECO's motion for involuntary dismissal which was signed on April 28, 1988. This appeal was dismissed by *742 order of this Court dated March 2, 1993 and is now definitive.

POSTURE OF THE CASE
Proper analysis of this action first requires an identification of the causes of action available to and urged by Rivnor on this appeal. Since no action for breach of a construction contract may lie in the absence of privity of contract between the parties, Impressive Builders, Inc. v. Ready-Mix, Inc., 535 So.2d 1344 (5th Cir.1988), Rivnor's only right or cause of action for a breach of contract is against O'Donnell, the only party with whom it had a contract. Similarly, because O'Donnell is the only party to contract with the architect and the various subcontractors, O'Donnell is the only proper party plaintiff who can assert a breach of contract suit against the architect or any subcontractor. Id. Rivnor's contract action against O'Donnell was filed April 3, 1985.
We reject Rivnor's contention that it can proceed directly against the subcontractors because the contract between the general contractor and subcontractors conferred a benefit on the owner, i.e., a stipulation pour autrui. In HMC Management Corp. v. New Orleans Basketball Club, 375 So.2d 700 (4th Cir.1979), at page 708, the organ of the court said:
"[7] The fundamental requirement of a stipulation pour autrui is that the third party relationship forms the consideration for a condition of the contract; the benefit derived from the contract by the third party may not merely be incidental to the contract or lease agreement in question. Shreveport v. Gulf Oil Corporation, 431 Fed.Supp. 1 ([W.D.La.]1975). In Hertz-Equipment Rental Corporation v. Houma (Homer) Knost Construction Company, Inc., 273 So.2d 685 (La.App. [1st Cir.] 1973), the Court stated:
`The jurisprudence requires that such a provision for the benefit of third persons be in writing and clearly manifest an intention to confer a benefit upon a third party.'"
We find no evidence in the record supporting the contention of a stipulation pour autrui. Hence, we conclude the contention is without merit.
Following the joining of all issues, the matter proceeded to trial. On May 26, 1988 and June 7, 1988, during the course of trial, but prior to the trial court rendering judgment, Rivnor settled its claim against O'Donnell, Saunders, and their insurers, respectively. Each settlement provided the settling defendant would make a cash payment to Rivnor and assign Rivnor all of the settling defendants' respective rights and claims against all other defendants and third-party defendants. Under the settlements, Rivnor no longer had a direct right of action in their individual capacity against any party to this litigation. However, Rivnor had the right to proceed against the remaining defendants in its capacity as assignee of the rights of O'Donnell and Saunders.
In its status as assignee of the rights and remedies of O'Donnell and Saunders, Rivnor contends the trial court made numerous factual and legal errors in its judgment on the main demand which must be corrected on appeal. The only other appellant on the main demand is Belou who has appealed devolutively following payment of the judgment by its insurer. As no appellant has briefed alleged errors absolving the Parish of Jefferson from liability, that issue is deemed abandoned and the Parish of Jefferson is dismissed. Uniform Rules, Courts of Appeal, 2-12.4; Oubre v. Bank of St. Charles and Trust Co., 499 So.2d 602 (5th Cir.1986), writ denied, 503 So.2d 20 (La.1987).

STANDARD OF APPELLATE REVIEW
An appellate court must affirm a trial court's factual findings unless it determines that the trial court committed "manifest error". See Quality Trans., Inc. v. Younger Bros., Inc., 366 So.2d 1042 (1st Cir.1979), writ denied, 374 So.2d 658 (La.1979).
The standard of appellate review as articulated in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) is:
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and *743 where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable."
See also Healy v. National R.R. Corp., 613 So.2d 1117 (5th Cir.1993).
Based on the precepts as outlined above, we now turn to a review of the trial court proceedings.

MAIN DEMAND
The trial court found, and the record clearly supports, numerous defects in the design and construction of the Honeywell Building. The two main areas of problems were the water leaks, which could be rectified only by dismantling and reassembling the window wall system, and structural deficiencies caused in part by improperly sized and spaced studs. The trial court determined that Rivnor allowed a reasonable time for O'Donnell and the various subcontractors to attempt to remedy these problems before beginning to make repairs on its own.
On appeal, the issues before us on the main demand concern who was responsible and/or can be held liable for the defects in the building; are the liable parties solidary obligors; what are the proper amount of damages, including attorney and expert fees; when does interest begin to run on the judgment; and should the judgment be reduced as a result of language in a builder's risk insurance policy.
Although Rivnor settled their claim against O'Donnell and Saunders during trial, a determination of the liability of these parties is necessary to determine who is responsible to Rivnor for the damages suffered. We must be mindful, however, that Rivnor's capacity in this lawsuit is limited to whatever rights and remedies are available to O'Donnell and Saunders, except with regard to Rivnor's tort action against Belou. Thus, Rivnor may now be identified as Rivnor, Rivnor/O'Donnell and Rivnor/Saunders as appropriate.

RESPONSIBILITY FOR DEFECTS

LIABILITY OF HERBERT O'DONNELL, INC.
The trial court found O'Donnell was 100% responsible for the cost of repairs and damages suffered by Rivnor. We agree.
Rivnor contracted with O'Donnell to design and construct a three-story office building for a specified price. The contractthe American Institute of Architects (AIA) Document AIII, Standard Form Agreement Between Owner and Contractor and the 1976 edition of the AIA Document A202, General Conditions of the Contract for Constructionprovides at paragraphs 4.3.1 and 4.3.2:
4.3 SUPERVISION AND CONSTRUCTION PROCEDURES
4.3.1 The Contractor shall supervise and direct the Work, using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract.
4.3.2 The Contractor shall be responsible to the Owner for the acts and omissions of his employees, Subcontractors and their agents and employees, and other persons performing any of the Work under a contract with the Contractor.
O'Donnell, the general contractor, hired the architect, Saunders, to provide plans and specifications for the building at a fixed price with no contractual supervisory obligations incident to construction. O'Donnell then hired subcontractors to perform various facets of the construction project. The project was built but, as found by the trial court, contained numerous defects caused, in part, by Saunders' deficient plans and specifications and the poor workmanship of O'Donnell and various subcontractors.
O'Donnell's duties under the contract included inspection of the work performed by the subcontractors to assure compliance with the plans and specifications and codal requirements. As noted by the trial court in its reasons for judgment:
".... the record is replete with instances in which O'Donnell failed to properly supervise, *744 discover and rectify, or coordinate the work being performed by his own personnel or by the subcontractor's personnel. The first glaring discrepancy is the slab itself which was constructed under the supervision of O'Donnell and was oversized for the shape of the Howmet window wall system which was subsequently installed. Then came the problem with control lines resulting in the walls being out of plumb and plane and the subs looking to each for responsibility as to who was responsible for the line. Discrepancies developed between the subs as to who was to fire proof the columns, where the fire proof gypsum board should have been installed, attachment methods for the high hats and studs, the actual installation of the window wall system wherein oversized glass was used and corrective methods were taken in the field which proved to be improvident. O'Donnell obviously elected to supervise the construction itself without using the architect as an architect is usually used in supervising construction of projects this size. And now having assumed all of these responsibilities is saddled with the liability for the redhibitory defects of the building."[4]
O'Donnell was charged by contract with the sole responsibility for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract. Thus, his duty to the owner was to conduct periodic inspections as needed to assure all work was performed properly, resulting in a building free from defects. This duty was clearly breached, resulting in a finding of liability against O'Donnell. Because the record clearly supports the trial court's determination that O'Donnell failed to properly perform its obligations under the contract, we affirm that portion of the trial court judgment holding O'Donnell responsible for all damages incurred by Rivnor.

LIABILITY OF SAUNDERS
Saunders prepared the plans and specifications for the Honeywell Building under contract with O'Donnell. The plans and specifications were found to be deficient which caused, among other problems, water leaks. The trial court found the major source of water entering the building was from the sill flashing at the bottom of the building and was contributed to by the cap flashing along the roof of the building; that Saunders was responsible for its design and its ability to function properly; and that Saunders' defective design resulted in 25% of O'Donnell's liability.
In reviewing the record, we cannot say the trial court's findings are in error. Although there was conflicting testimony as to who actually designed the cap flashing, the trial court resolved this conflict by finding Saunders was responsible "... for the design [of the cap flashing] and its ability to function properly." Additionally, discrepancies between the plans and specifications concerning the proper materials to be used on the job could have been avoided by providing greater detail and/or reviewing the plans and specifications for consistency. Based on the evidence presented, the trial court found there were "... vagaries and discrepancies in the plans and specifications which contributed to the overall failure of the building to perform as it should have." The court found 25% of O'Donnell's liability was caused by the errors attributable to Saunders. We see no manifest error in these findings and affirm that portion of the trial court judgment.

LIABILITY OF BRANDT GLASS COMPANY, INC.[5]
The trial court found Brandt contracted with O'Donnell to furnish and install the glass wall system. Brandt then contracted with Howmet to furnish the system. The trial court found:
"....that the installation of the glass wall was defective in many instances, including installing oversize glass requiring some field adjustments such as nipping the corners, *745 many instances of defective cutting, coping and sealing water diverters, non installation of setting blocks, defective installation of sill flashing, blocking of some weep holes, deficiencies at installation of the cap flashing. The evidence shows the deficiencies in the installation of the glass wall itself as well as the cap at the top of the wall and the deficiencies in the installation of the sill flash were a major contributor to the leak problem that the building experienced."
We agree with the trial court's findings.

LIABILITY OF HOWMET
Rivnor/O'Donnell asserts that the trial court erred in exonerating Howmet Aluminum Corporation from any liability and abused its discretion in refusing to permit the introduction in evidence of Howmet's updated HP-175 installation manual.
Rivnor/O'Donnell challenges the trial court's ruling to exclude the 1987 version of the HP-175 installation manual prepared by Howmet after the construction of the building in 1980. Shortly before commencement of the trial, Rivnor/O'Donnell discovered the existence of this new HP-175 manual on its own. Rivnor/O'Donnell claims that the revised manual contains drawings and installation instructions critical to proper installation of the system which were not included in the manual furnished by Howmet to Brandt for use in the installation of the system. The trial court refused to admit this manual when offered into evidence by Rivnor/O'Donnell.
Louisiana Code of Evidence Article 407 provides:
"In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the delinquent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility."
Post-accident repairs or precautions are inadmissible to prove the existence of a defect at the time of the accident. Landry v. Adam, 282 So.2d 590 (4th Cir.1973).
Rivnor/O'Donnell cites Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809 (La.1987) and the exception to the general rule found in Article 407 of the Louisiana Code of Evidence in support of its argument that the 1987 manual should have been admitted to show the feasibility of precautionary measures.
Toups, supra, pointed out that the policy considerations which exclude evidence of remedial measures in negligence cases are not applicable where strict liability is involved. Toups involved a strict product liability case and held that in such a case, evidence of remedial measures should be allowed insofar as they are relevant in establishing what the manufacturer of the product knew or should have known at the time of the injury. Also, in Toups, an expert for Sears testified that a warning about ignition of flammable vapors on a hot water heater manufactured by Sears was unnecessary. The court stated that the fact that Sears subsequently added a warning to its water heaters contradicted the expert's testimony that such a warning was unnecessary and should have been admitted into evidence to challenge his credibility. Therefore, Rivnor/O'Donnell's reliance on Toups, supra, is misplaced.
There is no evidence in the record to show that the changes in the 1987 manual were based on information available to Howmet in 1980; and, in fact, the court found that Howmet did not know of the information in the 1987 manual prior to the time it wrote the first manual. Thus, we find no error in the trial court decision excluding the evidence.
Howmet provided its HP-175 system, a curtain wall system made up of various extruded aluminum components. The HP-175 system includes a water diverter which diverts any water penetrating the outer wall back to the wall's exterior. Shop drawings, erection drawings, and an installation manual are provided with the system. Howmet supplied its HP-175 system to Brandt Glass Company in connection with the glass walls *746 installed by Brandt Glass for the Honeywell Building. The trial court found that the system provided and the services rendered by Howmet were adequate. The trial court further found that the problems which resulted from water leakage into the building were the results of the design deficiencies of the cap and sill flashings by the architect, and improper installation by Brandt.
The record is replete with evidence regarding the improper installation of the HP-175 system furnished by Howmet to the installer, Brandt Glass Company. Further, the record shows Howmet contracted with Brandt to provide its HP-175 system only, with no duty to provide supervision for installation. Thus, it was incumbent upon Brandt to properly install the system. If Brandt's personnel had problems, their duty was to contact Howmet for instructions and/or assistance. Brandt's failure to do so resulted in improper installation which contributed to the building's deficiencies.
The trial court found Howmet was not liable as they provided a system and services that, if properly integrated into the building and properly installed, would have performed as intended. Further, because Howmet had no supervisory duties, they have no liability for installation deficiencies.
Upon our review of the entire record, we cannot say that the findings of the trial court with regard to the improper installation of the curtain wall system attributed to Brandt Glass Company and the design deficiencies of the cap and sill flashing attributed to the architect Saunders are clearly wrong or manifestly in error. We therefore affirm the trial court's finding of no liability on the part of Howmet.

LIABILITY OF REPUBLIC ROOFING COMPANY, INC.
Rivnor/O'Donnell contends the trial court erred in absolving Republic Roofing of liability contending the cap flashing was improperly installed which led to water leaks. The trial court found Republic Roofing performed their work in accordance with the plans and specifications and with the standards of roofing companies in the area. The trial court found as a matter of fact that design deficiencies and not installation deficiencies caused the cap flashing to leak. Our review of the record does not reveal that the trial court's finding was manifestly erroneous or clearly wrong.
Not only does the record support the determination that the installation was proper, but also that Republic Roofing had installed the cap flashing in accordance with the plans and specifications. When a subcontractor constructs a building in accordance with plans and specifications not provided by that subcontractor, LSA-R.S. 9:2771[6] absolves that subcontractor from liability for design deficiencies. LeBreton v. Brown, 260 So.2d 767 (4th Cir.1972), affirmed, 277 So.2d 645 (La.1973). Winford Co., Inc. v. Webster Gravel and Asphalt, Inc., 571 So.2d 802 (2nd Cir.1990). Accordingly, the finding that Republic Roofing was not liable is affirmed.

INADEQUATE ECONOMIC DAMAGES
Rivnor contends the trial court erred in failing to award loss of rentals attributable to the period prior to commencement of the repair program in late 1987 and $1,500,000 for the diminution in value of the building attributable to the physical damages sustained and the anticipated future reduction in rentals and occupancy. Belou contends the trial court erred in awarding any damages for lost rentals based on the lack of evidence that vacancies were due to the construction problems.
Our review of the record shows support for the positions advanced by both parties. *747 However, when the entire record is reviewed, we cannot say the trial court abused its discretion in awarding damages for lost rentals of $380,446.00. The trial court found the building experienced a one year occupancy rate of 25% below that of other commercial properties in Metairie, Louisiana, and attributed this loss to the building's deficiencies. This amounted to 13,344 square feet that was not rentable at an average rate of $12.43, or $165,866.00. Further, the court found it would take 18 months to 2 years for the occupancy rate to stabilize at a point where it would have, had the building not experienced the defects. Finding the building would absorb 10% of the vacancies per year, the court assessed 1989's losses at $82,933.00 and 1990's losses at $41,647.00. Our review of the record reveals no abuse of discretion in this finding. Thus, the trial court's finding is affirmed.

LIABILITY OF BELOU & COMPANY ACOUSTICS, INC. AND CECO
Belou was the subcontractor hired by O'Donnell to perform drywall work. The trial court found Belou did not perform this work in accordance with the plans and specifications and was responsible to Rivnor for 25% of the damages incurred. Belou appeals this determination, contending the trial court erred in finding Rivnor had a valid unprescribed cause of action against Belou; that LSA-R.S. 9:2771 shields Belou from liability; and that the assessment of fault and the damages awarded were excessive and incorrectly apportioned.
Belou was added as a party defendant by amending petition filed on January 27, 1987. Following disassembly of the walls and measuring/testing of the metal studs in 1986 it was learned the studs were of insufficient strength and improperly spaced. Thus, the tort action filed against Belou on January 27, 1987 was timely filed.
Belou contends LSA-R.S. 9:2771 shields them from liability because their work was performed in accordance with Saunders' plans and specifications; that Saunders' plans and specifications and O'Donnell's supervision were inadequate; that CECO supplied non-structural studs contrary to their order of structural studs; that O'Donnell's job-site supervisor instructed them to increase the spacing of the studs; and the trial court erred in finding Belou at fault for using non-fire code gypsum board in the building stairwells.
The trial court found Belou ordered non-structural studs and, relying heavily on their experience as a drywall contractor in ordering and installing material, did not conform to the plans and specifications, thereby creating life threatening structural deficiencies. William Belou testified he knew CECO had C studs and screw studs and that he ordered non-load-bearing screw studs. These non-load-bearing screw studs were used on load-bearing walls. Thus, the trial court correctly granted CECO's motion for involuntary dismissal and held Belou responsible.
Further, Belou explained that their failure to use non-fireproof gypsum board was because the plans did not specify the location for this material. However, the specifications clearly provided that fire code gypsum board was required on the job. Because the Jefferson Parish Fire Code requires the use of fire code gypsum board in stairwells, Belou erred in not complying with this requirement.
Concerning the stud spacing, Belou's witnesses testified that O'Donnell's on-site supervisor instructed them to increase the spacing from sixteen inches on center to twenty-four inches on center. O'Donnell disputes this. The trial court, faced with a credibility call, found against Belou. On the record before us, we cannot say this was error.
As the plans and specifications were not followed, Belou cannot avail themselves of the provisions of LSA-R.S. 9:2771. For the above reasons, the trial court decision concerning the liability of Belou and CECO is affirmed.

SOLIDARITY
Rivnor contends that the trial court erred in failing to hold all defendants solidarily liable to Rivnor for the total damages sustained. We disagree.
*748 Solidary liability is not presumed, but must be proved by the party who asserts it. Yarbrough v. Federal Land Bank Assn., 616 So.2d 1327 (2nd Cir.1993). An obligation is solidary for the obligors when each obligor is liable for the whole performance of the obligation. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee. Civil Code Article 1794.
Solidary obligations may result, even though the parties are bound under separate contracts, if their respective breaches of their contracts combined and contributed to cause the same item of damages sustained by the plaintiff. Where the combined fault results in a loss for which defendants would be liable for the whole, the defendants' liability may be solidary. Town of Winnsboro v. Barnard and Burk, Inc., 294 So.2d 867 (2nd Cir.1974), writ denied, 295 So.2d 445 (La.1974). It is the coextensiveness of the obligations for the same debt, and not the source of liability, which determines the solidarity of the obligation. Weber v. Charity Hospital of Louisiana, 475 So.2d 1047 (La. 1985).
The trial court in this case concluded that the defects in the construction of the building did not result from the combination of the negligence or poor workmanship of the various subcontractors. The court found the design of the cap and sill flashings and the installation of the curtain wall system was the cause of the water leaks. Brandt, Saunders and O'Donnell were the responsible parties for this problem. Hence, Saunders' and O'Donnell's settlement renders the question of solidarity between these parties moot.
Belou's liability generally resulted from structural deficiencies. This is a factual finding made by the trial court and upon our review of the record, we cannot say that this finding was clearly erroneous. Therefore, as found by the trial court, each subcontractor was liable to the general contractor for only his or its share of the poor and deficient workmanship or lack of performance. Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970).

EXPERT WITNESS FEES
Rivnor contends that the trial court erred in its award of expert witness fees. Rivnor complains about the amount of expert witness fees awarded; the trial court's failure to award fees to certain experts; and the lack of an opportunity to present specific evidence at a hearing after trial with regard to the issue of expert witness fees. The trial court awarded $10,000.00 in expert fees for Rivnor's architect; $1,500.00 in fees for Rivnor's engineer; and $1,500.00 each for two real estate experts.
The award of expert fees is a matter within the great discretion of the trial court and should not be disturbed unless found to be manifestly erroneous or an abuse of discretion. Murphy v. Boeing Petroleum Services, Inc., 600 So.2d 823 (3rd Cir.1992); Oshinski v. Central National Ins. Co. of Omaha, 432 So.2d 929 (4th Cir.), writ denied, 440 So.2d 148 (La.1983). LSA-R.S. 13:3666(A) provides that expert witnesses called to testify in court shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required. Under LSA-R.S. 13:3666(B), the court shall determine the amount of the fees of the expert witnesses either (1) from the testimony of the expert relative to his time rendered and the cost of his services adduced at the trial or (2) by rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment. Further, the award of expert fees as a cost to be paid by the party cast in judgment rests within the sound discretion of the trial court. Trammel v. State Farm Mutual Auto Ins. Co., slip opinion 92-CA-1313 (1st Cir. August 9, 1993).
We find no abuse of discretion in the trial court's determination of expert fees without a hearing and its designation of certain expert fees as costs to be paid by defendants. A trial court may fix expert fees based upon trial testimony without holding a contradictory hearing. LSA-R.S. 13:3666(B); Hebert v. Broussard, 450 So.2d 1038 (1st Cir.1984). Although the trial court refused to cast certain expert fees as costs, Rivnor, the party seeking the change, has not *749 met its burden of proof to show this to be an abuse of discretion. Lafayette Airport Commission v. Roy, 328 So.2d 182 (3rd Cir.1976). Accordingly, that portion of the trial court judgment concerning expert witness fees is affirmed.

ATTORNEY FEES
Rivnor maintains the award of attorney fees should be increased. Belou argues there is no basis to award attorney's fees and thus that portion of the judgment should be reversed.
It is well settled that a party may only recover attorney's fees if provided for by contract or statute. General Motors Acceptance Corp. v. Meyers, 385 So.2d 245 (La. 1980); Woodmen of the World Life Ins. Society v. Hymel, 610 So.2d 195 (3rd Cir.1992), writs denied, 612 So.2d 103 (La.1993). Here, Rivnor's action is based on a breach of contract against O'Donnell and tort against Belou. There is no provision in any contract for the recovery of attorney fees nor is there a statutory basis to recover same in contract or tort. Accordingly, the trial court erred in awarding attorney's fees. However, as only Belou has appealed the trial court judgment, the award of attorney fees is definitive to all defendants except Belou. LSA-C.C.P. art. 2133; Schollian v. Ullo, 558 So.2d 776 (5th Cir.1990). Therefore, the judgment awarding attorney's fees is reversed as applied to Belou.

INTEREST
Rivnor/O'Donnell claims the trial court erred in awarding interest only from the date of judgment, rather than from the date of the breach of contract, or at the latest from the date of judicial demand.
The Fourth Circuit correctly held in Whitney National Bank of New Orleans v. Poydras Center Assoc., et al, 557 So.2d 422, 427 (4th Cir.1990):
The law is clear that legal interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated. LSA-C.C. art. 1938; Teledyne Movible Offshore, Inc. v. C & K Offshore Co., 376 So.2d 357 (3rd Cir.1979); Calhoun v. Louisiana Materials Co., 206 So.2d 147 (4th Cir.1968), writ refused 251 La. 1050, 208 So.2d 324 (La.1968).
Damages are due `from the moment' of an active violation of a contract (C.C.1932) and from `the time that the debtor has been put in default' when the breach has been passive. C.C.1933. A debtor may be put in default `either by the commencement of a suit, by a demand in writing ...' or in other ways. C.C.1911.

Alexander v. Burroughs Corp., supra, 359 So.2d [607], 613 [La.1978].
Thus, the determination of when legal interest begins to run turns upon when the existence of the debt becomes certain. The scope of PCA's obligation to Whitney did not become ascertainable until Whitney filed its suit for breach of contract. Accordingly, the trial court was correct in awarding legal interest from the date of judicial demand.
In Knecht v. Board of Trustees, 591 So.2d 690 (La.1991) the supreme court awarded legal interest in a breach of contract case from the date of judicial demand, finding it was not until judicial demand that it became clear the obligor would not perform.
The situation here is similar. Although the building was experiencing leaks prior to the date of judicial demand, O'Donnell and the subcontractors continued working to find the cause of the leaks and to remedy same. It was not until judicial demand that it became clear O'Donnell and the subcontractors would not adequately perform. Accordingly, we reverse that portion of the trial court judgment awarding legal interest from the date of judgment and hold interest is due from the date of judicial demand.

INCIDENTAL DEMANDS

LIABILITY OF AETNA
Rivnor contends that the trial court erred in absolving Aetna Casualty and Surety Company (hereinafter "Aetna") from any liability. Aetna was the insurer of Brandt Glass Company, Inc., the subcontractor which installed the window wall system on *750 the Honeywell Building. Aetna issued to Brandt Glass a special multi-peril policy and an excess indemnity policy for the period from June 1, 1981 through June 1, 1982. The trial court held that these policies did not provide coverage for the damages sustained by Rivnor as a result of the faulty installation by Brandt Glass.
The Aetna policies provide that the company will pay all sums which the insured shall become legally obligated to pay as damages because of property damage caused by an occurrence. Occurrence is defined as "... an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured ..."
The policies define "property damage" as (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss or use is caused by an occurrence during the policy period.
The policies also contain certain exclusions from coverage. In the multi-peril policy, the insurance does not apply to loss of use of tangible property which has not been physically injured or destroyed resulting from the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured. Further, exclusions (k) and (o) found in the comprehensive general liability provisions are replaced by exclusions included in the Broad Form Comprehensive General Liability Endorsement which states:
The insurance for property damage liability applies, subject to the following additional provisions:
(A) Exclusions (k) and (o) are replaced by the following:
(2) except with respect to liability under a written sidetrack agreement or the use of elevators,
(d) To that particular part of any property, not on premises owned by or rented to the insured,
(i) upon which any property damage arises, or
(ii) out of which any property damage arises, or
(iii) the restoration, repair, or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;
(3) with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operation", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.
The exclusions in the Excess Indemnity Umbrella Policy state that the policy does not apply:
(e) to property damage
(2) to that particular part of any property, not on premises owned by or rented to the insured,
(b) out of which any property damage arises, or
(c) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;
(3) to the named insured's products arising out of such products or any of such products, if such property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;
(f) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(2) the failure of the named insured's products of work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;
*751 Exclusion 2.2(E) in the excess policy is replaced by the following exclusion in an endorsement to the policy:
(4) to work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, if such property damage occurs after such work has been completed or abandoned and occurs away from premises owned by or rented to the named insured.
The claims by Rivnor against Aetna's insured, Brandt, are based solely on the basis of Brandt's defective workmanship, i.e., improper installation of the window wall system. In cases involving insurance policies with identical or substantially similar definitions of occurrence, Louisiana Courts have found no coverage where the liability of a contractor is based solely on improper construction or defective workmanship. This is based on the well-settled principle that liability policies are not intended to serve as performance bonds. Fredeman Shipyard, Inc. v. Weldon Miller Contractors, Inc., 497 So.2d 370 (3rd Cir.1986); Bacon v. Diamond Motors, Inc., 424 So.2d 1155 (1st Cir.1982); Vitenas v. Centanni, 381 So.2d 531 (4th Cir. 1980); Carpenter v. Lafayette Woodworks, Inc., 573 So.2d 249 (3rd Cir.1990).
The trial court found that the work product exclusions in the Aetna policies excluded coverage for all damages due to Brandt's faulty workmanship. Cases involving exclusionary provisions like those in the policies involved here have held that a liability insurer which includes a work product exclusion in its policy is not liable for damages to the work product of the insured due to the negligent, faulty, or defective construction and workmanship. Breaux v. St. Paul Fire and Marine Ins. Co., 345 So.2d 204 (3rd Cir. 1977); Fredeman Shipyard v. Weldon Miller Contractors, supra at page 375. Injury to work exclusions have consistently and unequivocally been held to eliminate coverage for the cost of repairing or replacing the insured's own defective work product.
In this policy at issue the usual work product exclusion (exclusion "o" in the multi-peril policy) is replaced by the additional exclusions under the broad form coverage endorsement, as quoted herein. Rivnor relies on the decision in Southwest La. Grain v. Howard A. Duncan, Inc., 438 So.2d 215 (3rd Cir.1983) in support of its position that the work product exclusion, as contained in the broad form coverage, does not apply to liability arising out of work performed by others on Brandt's behalf, as opposed to work performed by Brandt itself.
The effect of the broad form coverage endorsement, which deletes the words "or on behalf of the insured" in the exclusion provisions, is to provide coverage to the insured for liability arising out of work performed by others on the insured's behalf. Duncan, supra. Rivnor seeks to extend this to provide coverage for the glass manufactured by Pittsburgh Plate Glass (PPG) on behalf of Brandt Glass. Rivnor's position on this issue is based on Rivnor's claim that the trial court found that the glass was oversized and defectively manufactured by PPG. However, the trial court's findings with regard to Brandt Glass are limited to Brandt's defective installation of the glass wall. There was no finding that PPG improperly manufactured the glass, as contended by Rivnor. Therefore, the defective work involved was Brandt's work product (i.e., installation of the glass), which is excluded from coverage. If Brandt had subcontracted out all or a portion of the installation of the glass to another entity, and that installation was improper, the Aetna policy would provide coverage for liability arising out of the work performed by the other entity. However, such is not the case here.
In addition, the exclusions exclude damages to materials, parts, or equipment furnished in connection with the work performed by the insured. Thus, all materials, including the glass supplied by PPG to Brandt in Brandt's installation of the window wall system are excluded from coverage under the Aetna policies.
Rivnor also contends that the Aetna policies provided coverage for the repair and replacement of the work performed by Belou. The trial court found that Belou's work product (the installation of studs and the drywall) had to be replaced due to the failure of Belou to install the proper materials, not because of any damages caused by Belou's work product. *752 Further, Belou's work was not work performed on behalf of Brandt.
The next question to be resolved is whether the exclusions in the Aetna policies exclude coverage, not only for the cost of repairing or replacing the insured's work product, but also for other economic losses caused by the insured's defective work. As noted above, Louisiana courts hold that the "injury to work" exclusion excludes the cost of repairing or replacing the insured's work product. Louisiana courts also hold that the exclusion does not exclude damages to property other than the insured's work product. Hendrix Electric Co., Inc. v. Casualty Reciprocal Exchange, 297 So.2d 470 (2nd Cir. 1974); Hospital Service District No. 1 v. Delta Gas, Inc., 171 So.2d 293 (4th Cir.), writ refused, 173 So.2d 540 (La.1965); Vobill Homes, Inc. v. Hartford Accident and Indemnity Co., 179 So.2d 496 (3rd Cir.1965).
Rivnor relies on the decision of Todd Shipyards Corp. v. Turbine Service, Inc., 674 F.2d 401 (1982), which stated that the Louisiana courts had not addressed this question at the time of the decision in Todd, supra. However, after Todd, the Louisiana Supreme Court decided Borden v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983) which originally held that, where injury or destruction of property is not covered by a policy of insurance, the resulting loss of use of that property is not covered unless otherwise stipulated. This original holding in Borden, was premised on the belief that the policy in question defined property damage to mean (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
In the exclusions application to the broad form coverage afforded by the Aetna policy, exclusion "o" (the work product exclusion) is replaced by an exclusion "to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts, or equipment in connection therewith." The definition of property damage, as contained in the Aetna policies, is identical to the definition quoted above.
Prior cases have held that work product exclusions similar or identical to the exclusion contained in the Aetna policies exclude coverage for defective workmanship and consequential damages arising therefrom. Hallar Enterprises, Inc. v. Hartman, 583 So.2d 883 (1st Cir.1991); Barr v. Cool Vue Aluminum, Inc., 439 So.2d 1161 (4th Cir.1983); Magill v. Owen Construction Company, Inc., 434 So.2d 520 (2nd Cir.1983); Vitenas v. Centanni, supra; Breaux v. St. Paul Fire and Marine Insurance Co., supra; Vobill Homes, Inc. v. Hartford Accident and Indemnity Co., supra.
Accordingly, we affirm the trial court ruling absolving Aetna from liability based on the insurance policy's work product exclusions.

HARBOR INSURANCE COMPANY'S BUILDER'S RISK POLICY
Belou asserts that the trial court erred in failing to reduce the judgment amount by the amount of damages covered by the Harbor Insurance Company's builder's risk policy.
Pursuant to the contractual provisions between the owner and general contractor, a builder's risk policy was obtained from Harbor Insurance Company, effective November 17, 1980, with policy limits of $2,100,000.00.
The builder's risk policy, subject to the exclusions contained therein, insures against all risks of physical loss or damage to property in the course of construction in respect of occurrences happening during the policy period.
The policy exclusions include (a) any loss of use or occupancy, however caused and (b) the cost of making good faulty or defective workmanship, material, construction, or design, but this exclusion shall not apply to damage resulting from such faulty or defective workmanship, material, construction or design.
Article 11.3.6 of the general conditions of the contract between the owner and general contractor provides: *753 11.3.6The owner and contractor waive all rights against (1) each other and the subcontractors, sub-subcontractors, agents and employees, each of the other, and
(2) the architect and separate contractors, if any, and their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this paragraph 11.3 or any other property insurance applicable to the work, except such rights as they may have to the proceeds of such insurance held by the owner as trustee...
Belou claims that the effect of the above quoted provision acts as a waiver by Rivnor to seek reimbursement from the contractor, O'Donnell, or subcontractor, Belou, for the property loss covered by the builder's risk policy. Although this is correct, the exclusions, as noted above, apply to the loss of use or occupancy and since there is no coverage for this element of damage, there is no corresponding waiver of the right to seek reimbursement. We also view the architect's fees awarded by the court as part of the "cost of making good" the faulty workmanship of Belou rather than damage resulting from the faulty workmanship, and hence, excluded by the policy.

REPUBLIC/MARYLAND INSURANCE POLICY PROVISIONS
Maryland Casualty Company (hereinafter "Maryland") provided primary general liability insurance coverage to Herbert O'Donnell, Inc. (hereinafter "O'Donnell") from September 18, 1980 through May 30, 1984. Republic Insurance Company (hereinafter "Republic") provided excess liability insurance coverage to O'Donnell from September 18, 1980 through May 30, 1985.
Maryland and Republic entered into a joint stipulation which provided, in pertinent parts, as follows:
(1) Maryland and Republic settled the claims against them and O'Donnell with Maryland contributing $100,000.00 and Republic contributing $900,000.00 to the settlement;
(2) Prior to November 25, 1981, the Maryland policy provided property damage liability limits of $100,000.00 and on November 25, 1981, Maryland's policy limits were increased to $500,000.00;
(3) A single leakage "occurrence" took place, which leakage claim was covered by the respective policies issued by Maryland and Republic;
(4) The "occurrence" took place at a time when the respective policies provided coverage to O'Donnell;
(5) Republic's claim against Maryland is for $400,000.00 (the difference between the $100,000.00 paid by Maryland in settlement and $500,000.00, the amount Republic claims to be Maryland's underlying limits), advanced by Republic as part of its contributions to the settlement without prejudice to Republic's rights to seek reimbursement from Maryland for the $400,000.00;
(6) If Republic is successful in its claim against Maryland, Republic would be entitled to legal interest from the date the settlement funds were paid by Republic; and
(7) Maryland's policy defenses would be limited to the extent of (a) asserting that the November 25, 1981 amendment to its policy was not effective in respect to the claims alleged, and (b) whether the Republic policy provides coverage for amounts in excess of $100,000.00.
On May 26, 1988, Maryland and Republic, together with O'Donnell, settled the claims against them for $1,050,000.00 with Maryland contributing $100,000.00, Republic contributing $900,000.00, and O'Donnell contributing $50,000.00 to the settlement.
The Maryland policy provides that the insurer will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damages caused by an occurrence. The policy defines occurrence as "an accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Property damage is defined as "(1) the physical injury to or destruction of tangible property which occurs during the *754 policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
Republic Insurance Company, in its brief and in argument before this Court concedes that if the occurrence, as defined in the Maryland policy, occurred before November 25, 1981, Maryland's primary coverage would be $100,000.00 and no payment would be owed to Republic. If the occurrence occurred on or after November 25, 1981, Maryland's policy limits would be $500,000.00 and therefore Republic would be entitled to reimbursement in the amount of $400,000.00 plus interest.
The trial court obviously concluded that the occurrence which triggered the insurance coverage took place before the effective date of the increase in Maryland's limits, i.e., November 25, 1981.
It is clear from the evidence that O'Donnell's failure to perform its contractual obligations, i.e., its failure to construct the Honeywell Building in a workmanlike manner, occurred prior to November 25, 1981. The evidence showed the building experienced leakage problems prior to the acceptance of the building contract filed on September 21, 1981. Accordingly, we see no error in this portion of the trial court judgment.

CONTINENTAL CASUALTY COMPANY POLICY PROVISIONS
We now turn to the issue of whether Continental is obligated to pay the face amount of its policy, plus interest, without the contractual mandate of the reduction of the amount payable by the "claims expenses".
The Continental policy issued to Saunders provides for policy limits in the amount of $250,000.00 and allows for claims expenses to be deducted from the policy limit before payment of a claim. Claims expenses are defined by the policy as:
"A. fees charged by an attorney we designate, and
B. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a `claim' if incurred by:
1) us;
2) any attorney designated by us; or
3) by `you' with our written consent."
During the course of trial, Rivnor, Saunders, and Continental settled their differences for the Continental policy limits of $250,000.00. The settlement provided that Continental would pay Rivnor the amount Continental calculated was due under the policy ($250,000.00 less approximately $240,000.00 in claims expenses). However, Rivnor contested the deductible claims expense policy provision; thus, the parties agreed the enforceability of that provision would be reserved to the courts.
The trial court found the claims expense provision was valid. Rivnor appeals that determination and contends Saunders assigned his claims against Continental to Rivnor and that the claims expense provision is in derogation of the public interest or against public policy. Rivnor maintains the provision "... caus[es] a serious potential conflict of interest between the insured and the company."
Continental contends Saunders did not assign its rights to Rivnor and, as there is no privity of contract between Rivnor and Continental, Rivnor can only contest the provision through the Direct Action Statute. Secondly, Continental maintains the provision is clear, unambiguous, and not in derogation of the public interest or against public policy.
The settlement executed by the parties on June 7, 1988 contained an "... assignment by the settling defendants [Saunders and Continental] to plaintiffs [Rivnor] of all their rights, title and interest asserted or assertable by them against, without limitation, all named defendants and third party defendants, other than the settling defendants, in the proceedings ..." Thus, Saunders clearly did not assign Rivnor its claims against Continental. However, the settlement further provided the issue of the enforceability of the claims expense deduction provision would be submitted to the trial court (and appellate court) for decision.
*755 As stated by this Court in Thomas v. Kilgore, 537 So.2d 828, 830 (5th Cir.1989):
"An insurance policy is a contract to which the rules established for the construction of written instruments apply. Interpretation of the contract is the determination of the common intent of the parties. Intent is determined in accordance with the plain, ordinary and popular sense of the language used in the agreement. When the words of the contract are clear and explicit, courts may look no further to determine the parties' intent. Any doubt, however, in the interpretation of an insurance contract must be construed in favor of coverage for the insured." (Citations omitted)
However, an insurer may not limit its liability and impose conditions upon its obligations that conflict with statutory law or public policy. See Block v. Reliance Ins. Co., 433 So.2d 1040 (La.1983); Carroll v. State Farm Ins. Co., et al., 519 So.2d 265 (5th Cir.), writs denied, 520 So.2d 756 (La.1988).
Here, the policy language is clear and unambiguous in imposing the contractual provision that claims expenses are deducted from the policy limit before payment of a claim. Thus, we must determine whether the provision is against public policy.
We see no reason why an insurer cannot include a claims expense deduction provision in its insurance contract where the insured is sufficiently sophisticated to understand the significance and consequences of the provision. We know of no statutory prohibition against such a provision and find an architect is sufficiently sophisticated to understand the cost of defending a suit comes out of the same pool of funds available for payment of a judgment or settlement.[7]
Accordingly, we find the claims expense provision of the Continental policy is an enforceable provision of the contract between Saunders and Continental. That portion of the trial court judgment is affirmed.

RECAPITULATION
Accordingly, the trial court judgment is affirmed except as modified and reversed below:
1) Rivnor Properties is substituted for Northwestern Mutual Life Insurance Company;
2) Legal interest is awarded from the date of judicial demand;
3) The award of attorney's fees in favor of Rivnor Properties (Northwestern Mutual Life Insurance Company) and against Belou and Company Acoustics, Inc. is reversed. The attorney's fees awarded against other defendants is definitive.
REVERSED IN PART; MODIFIED IN PART, AND, AS MODIFIED, AFFIRMED.
NOTES
[1] This portion of the judgment may sometimes be referred to collectively as the "Main Demand."
[2] These portions of the judgment may sometimes be referred to as "Ancillary Demands" or "Ancillary Issues."
[3] Although the judgment is in favor of Northwestern, Rivnor Properties remains the proper party plaintiff to complete partnership business notwithstanding the fact Northwestern bought out its partners. See Cambre v. St. Paul Fire & Marine Ins. Co., 331 So.2d 585 (1st Cir.1976), writs refused.
[4] While the trial court referred to the defects as "redhibitory defects," there was no suit on the sale of the building to give rise to an action in redhibition.
[5] The fact that Brandt's actions resulted in 35% of Rivnor/O'Donnell's damages has not been contested on appeal, but is included herein for completeness.
[6] LSA-R.S. 9:2771 provides as follows:

Non-liability of contractor for destruction or deterioration of work
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evidence prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
[7] Department of Insurance Regulation 41, effective July 20, 1993, now expressly approves of "defense costs within limits" liability policies for architects.