United States Court of Appeals
Fifth Circuit

**F I L E D**

April 12, 2006

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-20398

Consolidated With

Case Nos. 03-20817 and 03-21021

_____

UNDERWRITERS AT LLOYD'S LONDON, ETC., ET AL.

Plaintiffs-Appellees,

WILLIAMS FIELD SERVICES COMPANY; TRANSCONTINENTAL GAS
PIPELINE CORPORATION

Intervenor Plaintiffs-Appellees,

versus

OSCA, INC., ET AL.

Defendants

OSCA, INC.

Defendant-Appellant,

-------------------------------------------------------------

UNDERWRITERS AT LLOYD'S LONDON, Etc; ET AL.

Plaintiffs,

versus

OSCA INC.; ET AL.

Defendants,

OSCA INC.

Third Party Plaintiff-Appellant

versus

UNDERWRITERS AT LLOYD'S AND/OR LONDON MARKET
INSURANCE, Etc.; ET AL.

Third Party Defendants,

AMERICAN HOME ASSURANCE COMPANY; AMERICAN
INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

Third Party Defendants-Appellees,

WILLIAMS FIELD SERVICES COMPANY; TRANSCONTINENTAL GAS
PIPELINE CORPORATION

Intervenor Plaintiffs-Appellees

---

Appeals from the United States District Court
For the Southern District of Texas
4:01-CV-2214

---

Before SMITH, DENNIS, AND PRADO Circuit Judges.

PER CURIAM:[*]

This case arises from a September 9, 1999 oil and gas well blowout on a fixed platform in the Gulf of Mexico approximately 100 miles off the Louisiana coast. The parties involved in this controversy include: (1) Newfield Exploration and its joint

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

venturers (Newfield),[1] the principal operator of the platform where the blowout occurred; (2) Certain Underwriters at Lloyd's London Subscribing to Policy No. JHB-CJP-1177, et al (Underwriters), which have already paid most of Newfield's damages and are claimants in subrogation; (3) Newfield's contractors, which were engaged in repair work on the well, OSCA, Inc., (OSCA) and High Pressure Integrity, Inc. (HPI); (4) Newfield's 'Company Man', or "eyes and ears" on the platform, Chalmers, Collins & Alwell, Inc. (CCA); (5) Newfield's insurers, Certain Underwriters at Lloyd's London Subscribing to Policy No JC8250-201417 (EED Underwriters), American Home Assurance Company (American Home) and American International Specialty Lines Insurance Company (AISLIC); (6) Williams Field Services, Inc., (Williams) a pipeline company engaged in transporting natural gas through a network of feeder lines from over two hundred production platforms, including the Newfield platform and Transcontinental Gas Pipeline Company (Transcontinental), a subsidiary of Williams, referred to hereinafter collectively with Williams; and (7) Chevron, owner of a production platform linked directly to the Newfield platform by

---

[1] Other joint venturer plaintiffs were Apache Oil Corporation, Continental Land and Fur, and Fidelity Oil. The interest owners will be collectively referred to as "Newfield."

3

one of Williams' feeder lines.[2]

Newfield, Underwriters, Williams and Chevron brought suit in federal district court against the well repair contractors, OSCA, HPI, and 'company man' CCA for damages resulting from the blowout. OSCA brought third party actions for coverage against American Home, EED Underwriters, and AISLIC. Following a jury trial, a verdict was returned holding all three of the contractors liable. The district court, accordingly, rendered a liability trial final judgment on March 3, 2003. The insurance coverage issues were tried separately by the district court, which rendered a final judgment on March 3, 2003, holding that (1) the policies issued by EED Underwriters and American Home did not cover OSCA for the accident and (2) the AISLIC policy did not "drop down" and therefore did not provide any protection until covered losses exceeded $10 million. As OSCA's liability in the underlying suit was $13,306,600.26, the court entered judgment against AISLIC for $3,306,600.26. OSCA then moved for a new trial or to amend the judgment, but the district court denied the motion. AISLIC filed a "motion for clarification," which the district court granted in an "Amended Declaratory Action Final Judgment" on September 9,

---

[2] Other interest owners in the Chevron platform were Petrofina Deleware, Inc., and AtoFina Pertrochemicals Inc. They are referred to collectively as Chevron.

4

2003. Relying on Exclusion D(4), the amended final judgment held that OSCA's "covered" losses never exceeded $10 million, meaning that the AISLIC policy was not triggered and AISLIC owed nothing.[3] OSCA appealed both the original and amended final judgments. OSCA is the only defendant with an appeal pending before this court.

### The blowout:

The blowout occurred while OSCA was attempting to set a bridge plug provided by HPI using coiled tubing to run the plug and necessary tools into the well. A bridge plug is "a down hole tool designed to isolate a lower zone while testing an upper section."[4] The appellant OSCA was hired to perform the necessary coiled tubing operations. Coiled tubing is small diameter flexible steel pipe wrapped around a spool. Tools and machinery, referred to as the "bottom hole assembly" or the "tool string" are attached to the end of the tubing and placed into the well. The coiled tubing unit operator then forces, or "snubs" the tubing into the well, conducts

---

[3] Exclusion D(4) of the AISLIC policy provides that the policy does not cover property damage to "that particular part of real property or fixtures on which any Insured or any contractors or subcontractors working directly or indirectly on behalf of any Insured are performing operations, if such Property Damage arises out of such operations."

[4] HOWARD R. WILLIAMS AND CHARLES J. MEYERS ET AL., WILLIAMS AND MEYERS OIL AND GAS LAW, Vol. 8 at 111 (2004).

5

the required procedure, in this case setting the bridge plug, and then pulls the tubing and remaining tools out of the well.

The contract between OSCA and Newfield required OSCA to perform work in a good and workmanlike manner and it was stipulated in the joint pretrial order that Newfield required back pressure valves to be included in the coiled tubing assembly. A back pressure valve is designed to close in the event of a sudden increase in pressure below the tool string. No back pressure valve was included in the tool string present in the well when the blowout occurred. The tool string itself was assembled by HPI and the operations were overseen by CCA personnel in communication with Newfield.

There was difficulty setting the bridge plug and the first two attempts were unsuccessful. On the third attempt, the tool string attached to the tubing suddenly stopped approximately nine hundred fifteen feet down in the well as if it had struck something. There was no known obstruction at that depth. The coiled tubing buckled and parted and gasses and condensate began to flow up. An uncontrolled blowout lasted for several days, and on the third day the gasses ignited. The blowout, fire, and resulting control operations caused significant damage. Fortunately there were no injuries.

The blowout, fire, and subsequent well control activities

6

resulted in a damaged well, lost hydrocarbons, and a severely damaged platform. In addition, the platform held a gas gathering system owned by Williams. The gas gathering system on the Newfield platform was connected to a feeder pipeline from a Chevron platform father out in the Gulf. The gathering system included an automated emergency shutdown system that was triggered by the blowout and fire. The system was damaged in the blowout and the pipeline remained shutdown for sixteen days. Pressure building up in the shutdown pipeline caused a safety system on the Chevron platform to flare off the pent up gas being produced by the Chevron wells. The only other alternative would have been to shut-in the Chevron wells, causing physical damage. OSCA does not appear to dispute that flaring the gas was the more prudent option.

**Facts relevant to the insurance coverage action:**

OSCA carried several layers of insurance coverage at the time of the blowout. Its primary coverage was provided by United Capital, a marine general liability policy with limits of $1 million; above that, OSCA carried an American Home's "Bumbershoot" policy with limits of $9 million in excess of the United Capital policy. Above American Home OSCA carried AISLIC's Policy, with limits of $75 million above the $10 million provided by the two underlying policies. OSCA was also insured by EED Underwriters, the EED standing for "Energy, Exploration, and Development," with

7

$10 million in limits with an excess policy providing $40 million above that $10 million. OSCA made claims on all of these policies except that provided by United Capital because, as is undisputed, United Capital is insolvent.

The trial court's ruling on the EED Underwriters policy has not been appealed. The district court held that the policy provided coverage only in the event of OSCA's gross or willful negligence. There was no such finding against OSCA; its liability was based on simple negligence.

On appeal AISLIC has conceded that its policy "drops down" to provide coverage if OSCA's losses thereunder exceed the amount covered by the underlying insurance policies or the Per Occurrence Retention of $2 million, which functions like a deductible. AISLIC's concession thus eliminates one of the issues on appeal. AISLIC is, however, still contesting coverage.

### Discussion- Liability Issues:

*Applicable Law:*

All of the parties agree that Louisiana's substantive law applies to the liability issues in this case by operation of the Outer Continental Shelf Lands Act, 43 U.S.C. §1331 *et seq.* As this court recognized in *Fontenot v. Dual Drilling Co.*, Louisiana law, not maritime law, applies on fixed platforms located on the Outer

Continental Shelf and this circuit has rejected attempts to have 'federal common law' override Louisiana tort law in such cases. 179 F.3d 969 (5th Cir. 1999).

### *Evidentiary Issues:*

### *Standard of Review:*

OSCA contends that the trial court's rulings on the admissibility of evidence are reviewed for abuse of discretion. *Johnson v. Ford Motor Co.*, 988 F.2d 573, 578 (5th Cir. 1993). Chevron agrees. Newfield, however, argues for a plain error standard of review claiming that OSCA failed to preserve the error by appropriate objection.

OSCA filed several motions in limine to prevent the introduction of the documents discussed below. The motions in limine were denied by the trial court as moot. The circumstances surrounding these rulings are rather odd. On March 13, 2002, the court issued two written orders providing that the court would dispense with its usual procedure of entertaining evidentiary objections in advance of trial, instead decreeing that the court would entertain objections at the time exhibits were offered.[5] The

---

[5] One order, dated March 13, 2002, reads: "[a]ccordingly, the Court will dispense with its normal procedure of admitting exhibits at the start of trial and require all parties to offer exhibits as they use them. Any non-frivolous objections can be

9

court reiterated this change in procedures in an order governing proceedings at trial issued the next day.[6]  OSCA claims that on March 14, 2002, the first day of jury selection, the judge reversed her position and stated that she would not consider any evidentiary objections not filed in advance of trial.  The motions in limine were denied as moot on March 15, 2002.  The parties dispute the reason that the motions in limine were moot. OSCA claims that the motions were moot because of the three pre-trial orders providing for contemporaneous objections.  Newfield and the other appellees argue that the motions were moot because the exhibits had already been admitted.  While it is not entirely clear, the record indicates that evidence was admitted on March 15, 2002. OSCA's argument as to when evidence was admitted is confusing and self-contradictory.  Chevron points to dialogue between the district court judge and a Newfield attorney during the direct examination of the first witness as the time the evidence was admitted, apparently "en mass." [7] The court's docket entry for the 15th also notes that exhibits were admitted as stated in the record and

made at the time each document is offered."

[6] "MS. BLANCHARD: That exhibit, that diagram has been previously marked as Newfield exhibit 12, Your Honor. THE COURT: All the exhibits that you all agreed to everything is in evidence except for the stuff you all indicated that you all were withdrawing. So you know what's in, right. MS. BLANCHARD: Yes."

[7] Chevron brief at 20; 102 R.11; Chevron R. Ex.17

refers to exhibit lists without any qualifier. In its reply brief, OSCA argues both that the evidence was never properly admitted and that the dialogue in the record cited as the moment of admission by Chevron was a reference to previously admitted exhibits.

Given the way the exhibits in this case were apparently admitted, the confusing and seemingly contradictory orders about the lodging of objections to evidence, and the motions in limine ruled moot, common sense supports a finding that OSCA sufficiently preserved its objection to warrant abuse of discretion review. On the other hand, Newfield cites to several places in the record where OSCA makes contemporaneous objections to evidence on relevance or other grounds. In the end, however, the standard of review does not have a pivotal effect on the resolution of the evidence issues raised in this appeal. As discussed below, neither assignment of error has merit even under the less deferential abuse of discretion standard.

*Introduction of October 1999 Corrective Action Report- subsequent remedial measure under FRE 407:*

Following the blowout OSCA performed a "root cause investigation" in compliance with its status as a member of ISO 9001.[8] Following the investigation OSCA prepared a report entitled

---

[8] *See* The International Organization for Standardization Website, http://www.iso.org (follow the "ISO 9000/ISO 14000" hyperlink, then follow the "introduction" hyperlink, and then

11

Nonconformance and Corrective Action Report and dated October 22, 1999. The report contained three sections: (1) the "incident" section, which essentially identified the Newfield blowout; (2) the "root cause" section, which set forth a determination of the causes of the blowout; and (3) the "corrective/preventative action" section which proposed new procedures, policies, and training as well as the review of old procedures, policies, and training.

The issue is whether the report was admissible in light of Federal Rule of Evidence 407. In an example of poor judgment, in its brief OSCA failed to mention that the report was redacted to omit the corrective/preventative actions section of the report. In addition the version of the report included in OSCA's record excerpts is the full unredacted version, with no notation that this version was never entered into evidence or shown to the jury.[9] Newfield, Chevron, and Williams pointed to this discrepancy in their respective briefs, but OSCA's reply brief makes no reference to the problem. OSCA's opening brief argument on the admissibility of the report does, however, note cases in which entire documents were held inadmissible so it seems likely that the distinction was not completely lost on counsel.

---

follow the "ISO 9000-2000 - Selection and Use" hyperlink)(last visited Mar. 31, 2006).

[9] *Compare* OSCA's R. Ex. 19 *with* Newfield's R. Ex. 2 *and* Newfield Exhibit 36.

12

OSCA argues that the trial court abused its discretion when it admitted the report into evidence in violation of Federal Rule of Evidence 407 (Inadmissible Subsequent Remedial Measures). Newfield responds that the report is admissible as a party admission and, as redacted, contains no material inadmissible under Rule 407. Federal Rule of Evidence 407 provides, in pertinent part "[w]hen, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct,...." The rule "rests on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." FED. F. EVID. 407 advisory committee's note. This principle has been applied by the courts "...to exclude evidence of subsequent repairs, installation of safety devices, changes in company rules, and discharge of employees, and the language of the present Rule is broad enough to encompass all of them." FED. F. EVID. 407 advisory committee's note. OSCA points out that Rule 407 covers more than physical repairs, it includes changes in policy and procedures. *See, e.g., In Re Air Crash Disaster*, 86 F.3d 498, 531-32 (6th Cir. 1996); *Hall v. Am. Steamship Co*., 688 F.2d 1062, 1066 (6th Cir. 1982). The report did include changes in policy and procedures, but those sections of the report were redacted before

13

the report went to the jury.

OSCA cites *Complaint of Consolidation Coal Co.*, a Third Circuit case involving an admiralty claim in which the court held that even the portion of a redacted memo discussing the investigation of the incident was excludable under Rule 407. 123 F.3d 126, 136 (3rd Cir. 1997). The memo in this case was described as a safety memo sent to all employees, which discussed the investigation of the accident, saying that an employee fell after a rope line broke, that the rope line had prior damage that should have been discovered by close inspection and cautioning all employees to inspect ropes carefully before using them. The majority in *Consolidation Coal* court, and OSCA, cite *Specht v. Jensen*, a civil rights case for the Tenth Circuit in which the court finds that it was not an abuse of discretion for the district court to exclude a press release describing both the defendant's investigation of the incident giving rise to the suit and the disciplinary measures taken against the police officers involved. 863 F.2d 700,701-02 (10th Cir. 1988).[10] The *Specht* opinion is

_____

[10] OSCA also cites two Fifth Circuit cases to support its argument. Both cases involved true remedial measures and not investigation results or redacted post accident reports and so are inapposite. *Mills v. Beech Aircraft Co., Inc.*, 886 F.2d 758 (5th Cir. 1989) (Excluding a shop manual rewritten by an aircraft manufacturer following the crash of a similar model.); *Grenada Steel Industries, Inc. v. Alabama Oxygen Co. Inc.*, 695 F.2d 883 (5th Cir. 1983) (Excluding subsequent alternative designs of a gas storage cylinder valve).

14

silent about whether a redacted version of the press release was offered as an option, but does cite *Rocky Mountain Helicopter*, a case from the same circuit, discussed below, as indirect but analogous support, perhaps recognizing that a redacted release may have been admissible. *Id.* at 702.

In response to OSCA's argument, Newfield and Chevron cite contrary case law and argue that the distinction between accident investigation results and remedial measures is relevant to the application of Rule 407. *Rocky Mountain Helicopter v. Bell Helicopters Textron* involved a helicopter crash allegedly resulting either from a defective trunnion, a part connecting the mast with the rotator blades, or from pilot error, including a decision to exceed the cargo capacity of the helicopter. 805 F.2d 907, 910 (10th Cir. 1986). The *Rocky Mountain Helicopter* trial court admitted evidence from a "Photoelastic Study of Stress in 214 Trunnions" that Bell conducted after the accident. Bell appealed on the ground that the study should have been excluded under Rule 407. *Id*. at 918. Bell argued both that the report communicated to the jury the fact that the trunnion had been redesigned and thus constituted evidence of a subsequent remedial measure and that the study itself was a subsequent remedial measure because, if conducted before the accident, it would have made the accident less likely to occur. *Id*.

The court rejected both arguments. *Id*. It rejected the first

15

on the grounds that the study had been redacted to exclude any mention of the trunnion redesign and that no reference had been made to one by any attorney or witness. *Id*. The court rejected the argument that the study itself was a remedial measure saying:

> It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post event tests or reports. It might be possible in rare situations to characterize such reports as measures which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic Study of the trunnion but rather the subsequent redesign of the trunnion.

*Id*. The court goes on to say that any policy considerations that underlie Rule 407 are both "not as vigorously implicated where investigative tests and reports are concerned" and that they are outweighed by "the danger of depriving injured claimants of tone of the best and most accurate sources of evidence and information." *Id*. (citing *Westmoreland v. CBS, Inc*. 601 F.Supp. 66 (S.D.N.Y. 1984)). A well-argued dissent filed in *Consolidation Coal* also cites and would seek to follow *Rocky Mountain Helicopter* and recognizes the distinction between remedial measures and investigation results. *Consolidation Coal*, 123 F.3d at 139. (McKee, J., dissenting).

Newfield and Chevron also cite *Prentiss & Carlisle Co., Inc.*

16

*v. Koehring-Waterous Division of Timberjack, Inc.*, for its holding that the findings of an investigation into the cause of an accident are admissible where any discussion of remedial measures is redacted. 972 F.2d 6, 9-10 (1st Cir. 1992). In *Prentiss & Carlisle Co.*, the trial court held that the analysis of the problem was not a measure within the meaning of Rule 407 and the First Circuit agreed. *Id*.

Bolstering their argument, Newfield and Chevron note that the NCAR prepared by OSCA was part of its obligations in compliance with its membership in ISO 9001, a membership used by OSCA as a sales tool. OSCA points out that as the report of the investigation was prepared, and the investigation itself was conducted "not out of a sense of social responsibility" but in order to gain the sales benefits of membership in a trade organization.  Thus, they argue, the social policy behind Rule 407 does not apply here. This argument comes primarily from a Fifth Circuit case, *Rozier v. Ford Motor Co.*, in which the court found that a "Trend Cost Estimate" studying alternate fuel storage placement in a model similar to the car that had exploded, triggering the lawsuit, was admissible both because it had been prepared before the accident and because it would have been "required in any event by a superior authority, the National Highway Traffic Safety Administration." 573 F.2d 1332, 1343 (5th Cir. 1978).  While compliance with ISO 9001 was not strictly

17

mandatory in the same sense that a directive from the NHTSA would be, the reasoning with regard to the social policy behind Rule 407 does have some applicability.

Although there is some inconsistency in the case law, the stronger argument and the weight of that case law convince us to affirm the trial court's admission of the redacted Newfield NCAR over any objection founded on Federal Rule of Evidence 407. OSCA also makes a brief argument that the Newfield NCAR should have been excluded under Federal Rule of Evidence 403 because any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The argument made by OSCA is essentially conclusory, and this is not surprising as the company's own evaluation of the causes of the incident is certainly probative and, while the document was surely prejudicial to OSCA's case, it does not follow that the prejudice was unfair.

*Introduction of evidence relating to "Ocean Energy Incident":*

At trial Newfield introduced evidence of a similar, but factually unrelated incident commonly referred to as "The Ocean Energy Incident." When the incident occurred OSCA was performing coiled tubing services on another platform, for another operator, on or about November 22, 1998 (approximately ten months before the Newfield blowout). OSCA was the sole contractor working for, and

under the direction of, Ocean Energy when the coiled tubing buckled and a blowout ensued.[11] Following the incident, OSCA generated a Noncompliance and Corrective Action Report ("Ocean Energy NCAR") in which OSCA listed both the root causes of the incident and proposed internal policy changes with the goal of making its coiled tubing operations safer. OSCA intended for these changes to go into effect by the spring of 1999, before the Newfield blowout occurred. The Ocean Energy NCAR was not redacted before being introduced into evidence. In addition to the NCAR, a presentation made to the Minerals Management Service and an accident report prepared by MMS about the Ocean Energy incident were entered into evidence.

OSCA argues that the trial court abused its discretion when it admitted evidence relating to the Ocean Energy Incident, and the Ocean Energy NCAR in particular. Specifically OSCA argues that the evidence is irrelevant and that any probative value the evidence does have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury and should have been excluded under Federal Rule of Evidence 403. Newfield counters that the incidents were substantially similar, occurring while coiled tubing was used on offshore oil and gas wells where it appeared that an obstruction may have been struck and the

---

[11] The Ocean Energy blowout did not result in any claim, lawsuit, or other action against OSCA.

19

tubing split, causing a blowout. The items listed as the causes of the Ocean Energy blowout were quite similar to those listed as the causes of the Newfield blowout on the Newfield NCAR, including excessive snub force, no back-pressure valve, and hydraulic limits set above eighty percent of coiled tubing minimum yield. At trial Newfield attempted to show that none of the new policies proposed in the Ocean Energy NCAR had been implemented on the day of the Newfield blowout and that had these policies been implemented the blowout would have been prevented.

The district court agreed that the evidence was admissible because Newfield made a showing that the Ocean Energy incident was substantially similar to the Newfield blowout. Evidence of other accidents may be used where it is shown that those prior accidents are substantially similar to the instant accident. *Ramos v. Liberty Mutual Insurance Co.*, 615 F.2d 334 (5th Cir. 1980), *decision clarified*, 620 F.2d 464. Further, "for purposes of proving other accidents in order to show defendant's awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the accident at issue should be relaxed ... any differences in the circumstances surrounding these occurrences go merely to the weight to be given the evidence." *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986); *See also Johnson v. Ford Motor Co.*, 988 F.2d at 579-80 ("However, even when

20

it is offered solely to show notice, the proponent of such evidence must establish reasonable similarity.").

Here, given the readily apparent similarities between the two incidents, and the similarity in the causes attributed to the two, the trial court did not abuse its discretion in finding that the incidents were substantially similar. In fact, Newfield's argument that had the recommendations made in the Ocean Energy NCAR been implemented the Newfield blowout may have been prevented is closely related to an argument that OSCA should have been aware of the dangerous condition created by its policies and procedures, and thus, even a finding of reasonable similarity would have sufficed.[12]

## Evidentiary Sufficiency: Liability

### *Standard of Review:*

---

[12] In addition to an argument under Federal Rule of Evidence 403, OSCA argues that the Ocean Energy evidence should have been excluded under Rule 407. This argument is entirely without merit. The Ocean Energy incident occurred roughly ten months before the Newfield blowout that gave rise to the instant litigation. The Ocean Energy NCAR and the Ocean Energy related MMR documents were all prepared before the Newfield blowout occurred. That fact makes clear that Rule 407, entitled "Subsequent Remedial Measures," does not apply. See *Notes of Advisory Committee on Proposed Rules*, Fed. R. Evid. 407 ("1997 Amendments...First, the words "an injury or harm allegedly caused by" were added to clarify that the rule applies only to changes made after the occurrence that produced the damages giving rise to the action. Evidence of measures taken by the defendant prior to the "event" causing "injury or harm" do not fall within the exclusionary scope of Rule 407 even if they occurred after the manufacture or design of the product."); *Rozier v. Ford Motor Co.*, 573 F.2d at 1343.

21

These assignments of error challenge the sufficiency of evidence supporting the jury verdict. *See* FED. R. CIV. P. 50(b). We review the denial of a motion for judgment as a matter of law de novo applying the same standard of review as the trial court. *Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs, Inc*. 293 F.3d 912, 918 (5th Cir. 2002); *Flowers v. S. Reg'l Physician Servs.*, 247 f.3d 229, 235 (5th Cir. 2001). OSCA submits that the ordinary standard of review for denial of motion for judgment as a matter of law should apply. *See Boeing Co. v. Shipman*, 411 F.2d 365, 373-74 (5th Cir. 1969). This court has held that "it is the function of the jury to weigh evidence" and that "its decision should be given deference if the record contains any competent evidence to support its findings." *Louisiana Bayou Furs, Inc*., 293 F.3d at 918. "It is clear that evidence in the record can support a jury verdict even if it is of such quality and weight that reasonable and fairminded [individuals] in the exercise of impartial judgment might reach different conclusions." *Id*. (quoting *Transoil (Jersey) Ltd. v. Belcher Oil Co*., 950 F.2d 1115, 1118 (5th Cir. 1992). Chevron concedes this standard of review. Newfield, on the other hand, argues that OSCA failed to preserve these issues for appellate review by failing to include them in its Rule 50 motions and asserts that a plain error standard is appropriate, and thus, the court should look only to find any evidence to support the

22

jury's findings. *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1424 (5th Cir. 1992). In its reply brief OSCA argues that the issues were preserved in paragraph one of its Rule 50 motion. The paragraph reads:

> Pursuant to Federal Rule of Civil Procedure 50, OSCA moves this court to set aside the verdict and Judgement entered on February 28, 2003 and enter instead a Judgment in favor of OSCA notwithstanding the verdict of the jury. Alternatively, OSCA moves this Court to set aside the jury's apportionment of fault and assign the overwhelming percentages of fault to [Newfield, CCA and HPI].

The paragraph scarcely mentions the subject of a claimed insufficiency of the evidence proving a breach of OSCA's duty of care. The paragraph does, however, mention a challenge to the jury's apportionment of fault. The brief attached to OCSA's motion also contains little or no mention of the evidentiary sufficiency supporting the jury's finding of a breach of the duty of care. The brief does contain an argument regarding the sufficiency of the evidence supporting the apportionment of fault. It seems both parties may be partially correct in their assertions about the preservation of the errors. In any case it is again not crucial to the final outcome as even under the standard of review more favorable to OSCA, OSCA's arguments are unavailing.

*Evidence failed to show that OSCA breached a duty of reasonable care or that OSCA should have been assigned 86% of the fault:*

In attempting to establish that the jury's verdict should be reversed for insufficient evidence of liability, OSCA makes two

23

primary points. The first is that evidence of OSCA's failure to live up to its own stated goals as documented in the Ocean Energy evidence is not evidence of a breach of its duty to act reasonably under the circumstances. The implication is that evidence of industry standards or practice is absolutely necessary to prove negligence here. OSCA cites no caselaw supporting this proposition. OSCA argues that its "aspirational goals" cannot be the standard of care because a potential tortfessor's duty under Louisiana Law does not require that he choose the best or even a better method or approach, just a reasonable one. *See Mathieu v. Imperial Toy Corp.*, 646 So. 2d 318 (5th Cir. 1995)(finding that police officers approaching a subject are not restricted to employing the best of several available alternatives, but must simply chose a reasonable one). That only a reasonable, and not a best or perfect, method of doing something is required is an accurate statement of Louisiana Law. A requirement that industry standards must be used to prove what is reasonable does not, however, follow from this premise. The lessons a party should have learned from past experiences are relevant to the reasonableness of its current behavior. Although it is not clear that the Ocean Energy evidence was the only evidence available to the jury in forming its findings on the appropriate scope of OSCA's duty, it would in this case be enough to support the verdict.

24

The second of OSCA's points relates to the jury's assignment of eighty-six percent (86%) of the fault for the incident to OSCA while assigning no fault to Newfield and only six percent (6%) to HPI and eight percent (8%) to CCA. OSCA asserts that there is insufficient evidence to support this allocation of fault. OSCA's argument focuses on the omission of a back pressure valve from the tool string being used when the blowout occurred. OSCA argues that because HPI was responsible for assembling the tool string and CCA was responsible for supervising the work on Newfield's behalf, the fault for the accident should have been more evenly split. Further, OSCA points out that HPI, CCA, and, through CCA, Newfield, all had knowledge of the absence of a back pressure valve, while OSCA claims to have been told to stay clear of the area where the tool string was assembled and that it was not told that a back pressure valve had been omitted. This argument on its face may make the allocation of fault sound unreasonable. As Newfield and Chevron point out, however, the jury was presented with evidence of other alleged mistakes made by OSCA that arguably caused the blowout, including OSCA's failure to set snub limits to 80% minimum yield and OSCA's failure to follow its own procedure and include a blind shear ram in the blowout preventer (BOP) used in the coiled tubing operation. These mistakes, in addition to OSCA's failure to inquire about the back pressure valve, are enough to support the jury's allocation of

25

fault.

## Evidentiary Sufficiency: Damages

*Insufficiency of evidence to prove the amount of damages actually caused by the blowout: Entered only final amounts, not any bills or invoices:*

OSCA asserts that the damages awarded by the jury were insufficiently supported by the evidence. To prove its damages Newfield called its own treasurer to testify to the invoices paid by Newfield for the repairs compelled by the blowout. Present in the courtroom were nineteen binders of invoices paid by Newfield to its suppliers and contractors for repairs relating to the blowout. The treasurer explained that each invoice was reviewed by an engineer for reasonableness and then again by her office and that the invoices were charged to one of four "Authorities for expenditure" (AFEs), which she described as engineer prepared budget and accounting records for individual Newfield projects. In this case there was an AFE for each of four "projects": well control, the relief well, repair of the platform itself, and the replacement well. In addition, the treasurer provided a summary of each AFE and testified to the kinds of charges attributed to each. On cross-examination OSCA brought out that the treasurer did not have personal knowledge of the accident or the engineering related calculations that went into the decisions to incur the costs paid

26

through the invoices. In addition to the testimony of its treasurer, Newfield also introduced the testimony of its vice president who personally witnessed the damage and also had responsibility for approving the invoices.

On appeal OSCA appears to be claiming that in order to meet its burden of proof Newfield had to enter evidence even more specific than this, which it characterized as total amounts paid under the insurance contract with the Underwriters.[13] This characterization is not particularly accurate, as the transcript of the testimony reveals that the discussion of the claimed damages was at times extremely specific. The treasurer identified and discussed in detail some of the individual invoices contained in the binders and she discussed in slightly more general terms the parts of the platform that had been damaged and replaced.

OSCA cites *Cleere Drilling Co. v. Dominion Exploration & Production, Inc.*, in support of its position that the evidence of damages was insufficient. 351 F.3d 642, 656 (5th Cir. 2003). In *Cleere Drilling*, in addition to reversing the district court as to several determinations of liability under various indemnity terms in

---

[13] OSCA appears to indicate that the numbers provided were representative of money paid under the insurance contracts with Underwriters. A review of the record reveals that the numbers reflect amounts paid to Newfield's creditors, by Newfield, for accident related supplies and services. The insurance coverage was never discussed in front of the jury, something OSCA actually complains about on appeal under a different assignment of error.

a contract, this court remanded for findings relating to the quantum of damages to be awarded. *Id.* at 656. The party found liable for some of the relevant damages asserted that the claimant of those damages failed to prove that they were reasonable and necessary. The court did not expressly disagree, but because of the fact intensive nature of the issue, chose to remand the case without discussion, or ruling on the inadequacies of the proof of damages. Moreover, there is circuit precedent authorizing proof of damages through introduction of summary evidence in lieu of voluminous records. *See New Amsterdam Casualty v. W.D. Felder & Co.*, 214 F.2d 825 (5th Cir. 1954). OSCA argues that while the evidence was admissible, it nevertheless was insufficient proof of the damages found by the jury. We disagree. All of the records were available to the defendants for pretrial discovery and for use during the trial. The defendants had ample opportunity to demonstrate any inaccuracy or falsity in the records or the summaries based upon them.

*Failure to reduce damages claim by the value of "betterment" or improvement:*

In addition to its argument that Newfield failed to adequately prove its damages in general, OSCA also argues that Newfield failed to reduce its damages claim by the value of "betterment" or improvement it obtained by replacing old equipment with new equipment and re-drilling a problem well. The well that suffered

28

the blowout had been giving Newfield significant trouble even before this incident. The coiled tubing work that sparked the blowout was being done to set a bridge plug and thereby shut off the deeper part of the well, a part that was apparently re-drilled and included in the requested damage amount. OSCA alleges that there was proof that the well had a collapsed screen and would have had to have been re-drilled anyway. OSCA would have the law provide that "[i]f the plaintiff in the compensatory damages claim does not also prove the amount of depreciation and reduction for betterment, the plaintiff has failed to provide competent proof of his claim for damages and is not entitled to recover." Newfield responds that it argued both before and at trial that betterment and depreciation were inapplicable because if compensated in the amount requested, Newfield would not have been placed in a better position than it was in before the blowout. Newfield argued to the jury that the damaged platform was only a year and a half old and would have outlived its own usefulness and been abandoned when the reserves below it were depleted. Thus, new components used in the repairs added no value. Newfield also points out that betterment and depreciation were discussed and argued at trial. Newfield's treasurer testified about how depreciation was calculated for tax purposes. She explained that the depreciation schedule for the property was over the life of the reserves and that all equipment was depreciated with respect to

29

all of the reserves held by the company, and not on a platform by platform basis. The treasurer also testified that there is no market for used platform components, so repairs had to be made new for old. Further, Newfield argued that the re-drill of the well was not an improvement as 13,000 feet of the original well were able to be reused, and the well was re-completed in the same reservoir as the original well with the same screens and methods that were used in the first well. After hearing these arguments and evidence, the jury awarded roughly $800,000 less than Newfield requested for costs to repair the platform and roughly $5,000,000 less than Newfield requested for the re-drill of the well. Thus, Newfield adds that to the extent the jury found deduction for betterment or depreciation appropriate, it made them, leaving little for OSCA to complain about on appeal.

Louisiana tort law does provide, as a general rule, that damages in a tort suit are to place the injured party in "as good a position as before his property was damaged, but not a superior position." *Mossy Motors, Inc. v. Sewerage and Water Board of New Orleans*, 753 So. 2d 269, 280 (La. Ct. App. 1999). The implications of and exceptions to this rule are not particularly clear. For example, the Louisiana Supreme Court has held, in a case involving damage to a house, that appropriate damages were the estimate given to repair the damage less depreciation. *Reisz v. Kansas City S.*

30

*R.R. Co.*, 935, 88 So. 120, 122 (La. 1921). In *Reisz*, however, there appeared to be no evidence, or conflicting evidence, in the record on the value of the depreciation; the court declared that an allowance of one-third for depreciation was fair and equitable and apparently did not put the burden of proof on the plaintiff. *Id.* Another Louisiana Supreme Court case, this time involving low income housing owned by the Catholic Archdiocese that was damaged in a fire, rejected a rigid cost of repair less depreciation rule and allowed the Archdiocese to recover the full cost of restoration reasonably incurred. *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So. 2d 874 (La. 1993)("Some of our own courts of appeal have approved such limitations, including a rigid 'cost of replacement, less depreciation,' test, evoking this court's pointed admonitions that no mechanical rule can be applied with exactitude in the assessment of property damage under Article 2315[14] and that every case must rest on its own facts and circumstances.").

The *Mossy Motors* case, quoted above, slightly confuses the issue. 753 So. 2d 269. In *Mossy Motors* the court allowed the plaintiff car dealership to recover the full cost of replacing a damaged showroom with several smaller buildings amounting to the

---

[14] Article 2315 of the Louisiana Civil Code is the article from which almost all tort liability under Louisiana Law springs.

same square footage at a comparable price to restoring the single building. *Id*. at 274. The new buildings were in compliance with current building code and had to be designed under regulations required by contract with General Motors because the dealership's new buildings were not grandfathered in, as the old one had been. *Id*. The fact that the old showroom had depreciated and suffered some damage before the defendant's tortious actions was not used to discount recovery. *Id*. at 277, 280. This analysis followed and expanded on that in *Roman Catholic*.

*Mossy Motors*, however, also held that there was inadequate information about damages claimed in reference to a service building to show that a full reconstruction was necessary or to support the estimates provided by the plaintiff's expert for repairing the structure. *Id*. at 280-81. It is in this part of the opinion that the above quote from this case may be found. The repair work had not yet begun, so firm cost amounts were not available. *Id*. It is this uncertainty about the extent of the necessary repairs and their actual costs that seemed troubling to the court. *Id*. The court reduced the trial court's award by the full amount allocated for the service building and remanded for further findings. *Id*.

The case relied on by OSCA is a Fifth Circuit opinion decided under federal maritime, not Louisiana, law and is also substantially distinguishable. *See Pizani v. M/V Cotton Blossom*, 669 F.2d 1084

32

(5th Cir. 1982). The case involved a dock damaged in multiple collisions with a steamboat. *Id*. at 1086. The plaintiff dock owner's only proof of damages was a report prepared by a construction firm who made a lump sum bid to effect all of the repairs made. *Id*. at 1086. Repairs were made to all five pile clusters even though only two were damaged by the steamboat collisions. *Id*. at 1086-87. Also, while all but one of the original pile clusters were made up of only three or four pilings, the repaired clusters each contained five pilings. *Id*. The court found that these "repairs" clearly constituted improvements and noted that because only a lump sum bid had been submitted it was impossible to isolate the cost of the damages actually attributable to the steamboat damage. *Id*. at 1087. The district court in the case had acknowledged that "repairs" rendered may have included improvements, but held that the defendant was responsible for establishing the differential in cost. *Id*. at 1088. The district court awarded the entire lump sum bid as damages. The Fifth Circuit disagreed saying:

> We know of no rule shifting this burden to the defendant every time a plaintiff succeeds in introducing into evidence some figure denominated 'the cost of repairs.' Indeed, it has explicitly been held that when a defendant shows that the figure claimed by the plaintiff includes non-compensable improvements, the plaintiff must prove the amount of such improvements, i.e. the amount by which the original figure must be decreased.

*Id*.

The defendant argued that the case should not only be reversed, it

should be dismissed as well and the court acknowledged that such a rule exists in the common law but chose to exercise equity power to remand the case for further findings instead. *Id*. at 1089.

As noted above, *Pizani* was decided under federal maritime law, and the parties to this case have stipulated to the applicability of Louisiana law. Further, *Pizani* may be distinguishable for reasons other than choice of law rules as least as far as deductions for depreciation are concerned. A requirement that a plaintiff take care to exclude the costs of repair of things not damaged, like the additional three clusters, and the use of not only new, but better or more substantial materials, may be different from a requirement that the plaintiff in every case calculate depreciation and prove it at trial. This distinction applies to OSCA's objection to new for old repair of the platform, but would not apply to OSCA's contention that the need for a replacement well was not entirely attributable to the blowout because it was already damaged. In addition, the trial court in *Pizani* awarded the full amount requested. Here the jury verdict awarded substantially less than the amount sought.

OSCA also cites another Maritime Law case, involving another damaged dock. *Freeport Sulphur Co. v. S/S HERMOSA*, 526 F.2d 300 (5th Cir. 1976). In this case the repairs to the dock were found to have increased its useful life by ten years. *Id*. The district court deducted the value of this improvement from the award based on a

34

depreciation formula. *Id*. The major issue on appeal was the method of calculating this deducted value. *Id*. The case is not directly applicable, but does hold that any increase in the value of the plaintiff's property from its pre-tort level attributable to repairs should offset the recovery of the cost of the repairs. *Id*. at 304. The case also recognizes, however, that the only value of the repairs to the dock were in the extension of its useful life, and in discussing how to calculate the value of the extension, the court cites a Ninth Circuit case where no value was awarded because the repaired item, a bridge pier, had only the useful life of the thing it served, the bridge, and any extension of its useful life beyond that of the whole bridge was without value. *See Oregon v. Rug Go-Getter*, 468 F.2d 1270 (9th Cir. 1972).[15] The *Freeport* court agreed, saying "where the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for deprecation." *Id*. at 305-06.

Newfield argues that Louisiana puts the burden of proving depreciation on the defendant, citing *Louisiana Power & Light, Co. v. Smith*, 343 So. 2d 367, 372 (La. Ct. App. 1977). The case involved a light pole damaged in an auto accident and the major issue was the calculation of damages. *Id.* at 368. The court holds,

---

[15] Other circuits have also recognized this principle. *Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973); *United States v. Ebinger*, 386 F.2d 557 (2nd Cir. 1967).

*inter alia*, that "any effort to effect an offset as a method of reducing damages is the burden of the party seeking the offset. Thus if the record clearly supports a plaintiff's contention that the cost of a new pole (required to be installed because the pole has been destroyed), is a particular amount, then it is the defendant's burden to show that such amount should be reduced by applying some depreciation factor." *Id.* at 372.

The *LP&L* case also supports Newfield's position that where repairs have "no discernable life expectancy beyond a period for accounting purposes," depreciation should not be taken into account in determining the proper measure of damages. With respect to the new for old repairs done to the platform, Newfield's argument that new materials do not increase the useful life expectancy of the platform, which without the accident would have "outlived" the reserves beneath it, is convincing. New repairs to a year and half old platform that would have outlasted its usefulness appear to have essentially no economic value.[16] This is what Newfield argued, and in an adversarial system it makes sense to require OSCA to prove otherwise. In fact at trial OSCA did attempt to argue for depreciation and, to the extent that the deficit between what

---

[16] The LP&L discussion of accounting or tax depreciation for the light poles sounds very similar to the one Newfield's treasurer testified that Newfield used for platform equipment. *Louisiana Power & Light, Co. v. Smith*, 343 So. 2d at 370-71.

36

Newfield asserted as damages and what the jury awarded, OSCA was likely successful. Under Louisiana law, Newfield's damage award must be affirmed.

*Abuse of discretion in refusing mention of the Underwriters and prevention of OSCA from confronting Underwriter witnesses about Newfield's damages claim:*

OSCA complains about the trial court's ruling that Newfield, Newfield's joint venturers, and its insurers subrogees, Underwriters, must be referred to only as "Newfield" during the jury trial. OSCA argues that this was reversible error. Newfield counters that OSCA failed to object at trial, an assertion OSCA does not contest in its reply brief. As no objection was made, the plain error standard of review applies. *Dixon v. International Harvester Co.*, 754 F.2d 573 (5th Cir. 1985); *Johnson v. Helmerich*, 892 F.2d 422, 425 (5th Cir. 1990). Under the plain error standard of review the appellant must show that there was error, that it was plain or obvious, and that his substantial rights were affected and that, uncorrected, the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Price v. City of San Antonio*, 431 F.3d 890, 894 (5th Cir. 2005). Given that there is ample authority for the proposition that a district court judge is governor of the trial, and a good reason for the order, namely simplification of an already overpopulated jury trial, there is no

plain error.[17] *See Helmerich*, 892 F.2d at 425.

*Chevron and Williams: damages foreseeable and recoverable under Louisiana Law- scope of duty:*

To prevail on a negligence claim under Louisiana Law a plaintiff must prove five elements: "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of the duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1992)(*on reh'g*)(*citing Fowler v, Roberts*, 556 So. 2d 1, 4 (La. 1989).

With respect to Williams' and Chevron's claims the first two elements are tied together with OSCA's liability for the blowout in general, and as such have been discussed above or are not at issue on appeal. The third element, cause-in-fact, appears to be uncontested with respect to both Williams' and Chevron's claims. As does the fifth element because the amount of damage was either

---

[17] Newfield also points out that as it had over $3,000,000 in unreimbursed damage claims, it was a real party in interest.

stipulated to by the parties or entered in a judgment as a matter of law uncontested on appeal.

It is thus the fourth element, legal cause or scope of liability, that OSCA contests on appeal. The analysis of legal cause depends on the facts in each case. *See PPG Indus. Inc. v. Bean Dredging*, 447 So. 2d 1058, 1061 (La. 1984). Under Louisiana's duty risk analysis, this element is satisfied where "the harm which befell the plaintiff [was] easily associated with the type of conduct engaged in by the defendant." *Roberts v. Benoit,* 605 So. 2d at 1054. Foreseeability is one part, but not all, of the legal cause analysis. *Hill v. Lundin & Assoc., Inc.*, 256 So. 2d 620, 622 (La. 1972)("Foreseeability is not always a reliable guide, and certainly is not the only criterion for determining whether there is a duty risk relationship. Just because a risk may foreseeably arise by reason of conduct, it is not necessarily within the scope of the duty owed because of that conduct. Neither are all risks excluded from the scope of duty because they are unforeseeable. The ease of association of the injury with the rule relied upon, however, is always a proper inquiry."). Several cases also note that, at its heart, the element describes a policy choice. *Roberts v. Benoit*, 605 So. 2d at 1052.

### *Williams:*

Williams argues that, assuming underlying negligence liability

39

for the blowout was proved, OSCA stipulated to liability for damages to Williams' property. Williams directs the court's attention to the transcript of the trial court's consideration of several Rule 50 motions, including one Williams recorded before the case went to the jury. The record reads as follows:

> THE COURT: Do we really have any disputed issue with respect to causation for either Chevron or Williams?
> MR. BREAUD [counsel for OSCA]: Your Honor, we do as to Chevron.
> THE COURT: Because?
> MR. BREAUD: Not to Williams...

117 R. 26 . Williams asserts that OSCA waived any causation argument and cannot raise it on appeal. OSCA denies that this argument was waived. A brief review of the context of the above quoted dialogue does indicate that OSCA admitted that if it were to be found liable to Newfield, it would also be liable to Williams and that on that basis the court removed a jury interrogatory about the cause of Williams's damages.

Even if we were to find that the issue was not waived, the evidence at trial overwhelmingly proves that the blowout was the legal cause of the damage to Williams' equipment. Williams' damaged equipment was located on the platform at the time of the blowout, as usual, and was damaged by the fire and well-control efforts. OSCA argues that it is not liable to Williams because "OSCA could not have been aware of a risk to Williams' automated natural gas metering equipment," and that the risk to the equipment was not a

40

foreseeable risk associated with the coiled tubing operations." Williams responds that the gas gathering system was in plain sight and visible to anyone. It also argues that the cases cited by OSCA actually support the verdict in favor of Williams' and against OSCA. *See Consol. Aluminum Corp. v. CF Bean Corp*. 833 F.2d 65 (5th Cir 1987); and *PPG Industries v. Bean Dredging*, 447 So. 2d 1058 (La. 1984). Both cases will be discussed in greater detail below, but both involve dredging vessels striking submerged pipelines. In both cases the owner of the damaged pipeline was awarded damages even when parties with more remote claims were barred from recovery. Williams argues that its situation is closer to the owners of the damaged pipelines than the chemical plants claiming damage for physical damage due to loss of electric power resulting from the shut off of the flow of gas or the economic loss incurred in purchasing replacement gas at a higher price. This argument is convincing and OSCA does not offer much in the way of counter-argument. Williams damages were physical and directly caused by the blowout, fire and well control activities. There appears to be a strong ease of association; one at least as strong as for damage to any other equipment on the platform. OSCA's claim that it lacked knowledge of the equipment's presence is undermined by the fact that the equipment was in plain view and that as a sophisticated actor in the oil and gas industry OSCA obviously knew that Newfield was

41

producing gas from the wells serviced by the platform and would need to move the gas off the platform to be sold.[18]

<em>Chevron:</em>

Chevron was also awarded damages and OSCA's case for reversal on appeal is stronger with respect to these damages. Again the main issue is whether the element of legal cause or scope of liability has been established. OSCA argues that liability for damages for lost gas production on a platform twenty miles away from the Newfield platform was unforeseeable and thus is outside the scope of its duty. Chevron disputes both the unforseeability of the damages and OSCA's characterization of Louisiana law as equating foreseeability with the legal cause inquiry.

As noted above Louisiana law holds that the legal cause/scope of liability inquiry depends on the facts of each case. Both parties, however, cite cases with fact patterns they deem instructive. OSCA cites Consolidated *Aluminum Corp v. C. F. Bean Corp.*, 833 F.2d 65 (5th Cir. 1987), decided under federal maritime law, in which a dredge struck and ruptured a gas pipeline causing the release of a large amount of natural gas. To stop the flow, the

---

[18] It is basically impossible to store gas on a platform, and natural gas cannot be shipped unless it is liquified, which is something done in specialized facilities and not on site on a platform. Thus, the existence of a pipeline attached to the platform, and equipment to use the pipeline on the platform, was essentially certain.

pipeline owner closed the nearest valve, causing an interruption in service to the Consolidated Aluminum Manufacturing Plant. Consolidated's equipment was physically damaged due to the interruption. *Id.* Consolidated was the only aluminum manufacturing plant in the United States designed with only one source of electricity readily available. *Id.* Natural gas provided by the pipeline in question fueled on-site generators which in turn powered the plant. *Id.* The plant did not keep a store of fuel oil even though the generators would also have run on it. *Id.* When the flow of natural gas was interrupted by the dredge collision, the generators stopped producing electricity and the plant equipment was physically damaged by the shut down. *Id.* The Fifth Circuit denied recovery to Consolidated. *Id.* OSCA argues that Chevron and Consolidated's situations are analogous. Chevron responds that *Consolidated* was decided under federal maritime, and not Louisiana, law and that, in addition, the policy behind the two situations is distinguishable. In *Consolidated*, the plant was unique in its industry in its reliance on one source of power. Chevron's platform in the Gulf is not at all out of the ordinary in its dependence on one pipeline, routed though another platform, to gets its natural gas to shore. On the other hand, there is an obvious similarity where a damaged pipeline leads to physical damage for a pipeline customer, and in *Consolidated* there was no recovery.

43

OSCA also cites a Louisiana Supreme Court case involving a pipeline damaged by a dredge. *PPG Indus. V. Bean Dredging*, 447 So. 2d 1058 (La. 1984). This case, however, involves a customer of the pipeline company suing the dredging company, not for physical damage to its equipment, but for the economic cost of purchasing replacement fuel at a higher price. The Louisiana Supreme Court applied a duty-risk analysis and denied recovery for the economic loss. OSCA characterizes this as a holding against the award of damages to a downline customer caused by a damaged pipeline. Chevron argues that the case merely makes a distinction between economic and physical damages, holding that the economic damages of a physically damaged party's customers are not within the scope of a tortfeasor's duty. Chevron points out that this case is then distinguishable because it, Chevron, suffered physical damage when its gas was flared.[19]

In support of its trial court victory, Chevron cites another Louisiana Supreme Court case, *Cleco Corp. v. Johnson*, 795 So. 2d 302 (La. 2001). Chevron argues that this case continues and clarifies a distinction between unrecoverable "indirect economic

---

[19] Although decided under federal maritime law, the Fifth Circuit has held that the flaring of natural gas to avoid damage to an oil company's wells qualifies as physical damage. *See Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 201-02 (5th Cir. 1995); *Pennzoil Prod'g Co. v. Offshore Express Corp.*, 943 F.2d 1465, 1473 (5th Cir. 1991).

damages" and recoverable "direct physical damages." In *Cleco*, a truck struck a utility pole owned by Cleco, an electric utility company. The collision caused a voltage surge on the electrical lines supported by the pole. The voltage surge damaged electrical equipment and appliances owned by Cleco's customers. Cleco settled its customers claims and sued in subrogation. The Louisiana Supreme Court found that there was an ease of association between the truck driver's actions and the damages to the customer's property.

Chevron argues that the *Cleco* holding supports a finding that Chevron's damages were foreseeable. In its view, poor driving leading to a car accident, leading to liability for damaged household appliances, is not more foreseeable than negligent operations on an offshore oil rig leading to a fire, leading to liability for damaged petroleum products. Also, *Cleco* cites with approval *Istre v. Fidelity Fire & Casualty Inc. Co.*, 628 So. 2d 1229 (La. Ct. App. 1993), a case in which a backhoe operator who negligently damaged a buried power cable was held liable for personal injuries sustained in an automobile accident at an intersection four miles and an hour away. The backhoe's injury to the powerline cut power to a stoplight at the intersection.

Chevron's argument is that if liability in *Cleco* and *Istre* was foreseeable and/or easily associated, surely a sophisticated oil industry services provider could foresee that negligent operations

45

could cause a blowout of petroleum products, and that where this occured in the Gulf, a network of pipelines would quite likely be involved. We agree. The factual situations in the Louisiana cases *Cleco* and *Istre* are more closely analogous to the situation at hand than that in *PPG Industries*. We affirm the jury verdict as to OSCA's liability to Chevron.

## Discussion- Insurance Coverage Issues:

### *AISLIC*

#### *The D(4) Exclusion:*

The district court interpreted Exclusion D(4) to bar coverage for platform repair expenses, relief well costs, well re-drill costs, and lost hydrocarbons. Exclusion D(4) excludes coverage for property damage to "that particular part of real property or fixtures on which any Insured or any contractors or subcontractors working directly or indirectly on behalf of any Insured are performing operations, if such Property Damage arises out of such operations." OSCA emphasizes the words "particular part" and argues that this exclusion can apply only to the specific part of the property or fixture on which OSCA was working. OSCA submits that this particular part was the casing at the top of the well and that portion of the production deck of the platform immediately surrounding the casing. Under this interpretation of the provision AISLIC's policy would still cover most of the platform and re-drill

46

damages as well as the relief well and lost hydrocarbons. AISLIC argues that the exclusion is broader and that the property on which OSCA was working includes the entire well and platform. AISLIC argues that the well and platform are connected and constitute one piece of property, that OSCA was working on the well from the platform, and that OSCA was hired to lower a tool string thousands of feet into the well.

OSCA centers its argument on this point around a Missouri Supreme Court case involving a fire in a newly constructed home started by a painting contractor. *Columbia Mutual Ins. Co. v. Schauf*, 967 S.W.2d 74 (Mo. 1998). The painting contractor, who was hired to paint all of the home's interior and exterior surfaces, had finished spraying laquer on the kitchen cabinets and was cleaning his spray equipment in the kitchen when his pump generator started a fire. *Id.* at 76. The fire caused extensive damage throughout the house. *Id.* When the fire started some of the contractor's employees were painting in a bedroom. *Id.* The contractor held a business owner's liability policy that contained an exclusion essentially identical to D(4). *Id.* In applying the exclusion, the *Schauf* court found that only damages to the kitchen cabinets themselves were excluded. *Id.* at 81. The insurer had argued that damage to the entire house was to be excluded because the contractor was scheduled to work on all of the property. *Id.* at 80. The *Schauf* court opined

47

that "[b]y using the words *particular part*, the provision evidences the intent to narrow the scope of the exclusion as much as possible. In other words, the subject of the insured's work is defined with great specificity." *Id.* at 80 (emphasis in original). The court noted that both the contractor and the insurance company's interpretations of the phrase "particular part of real property" and that the existence of two reasonable interpretations made the exclusion ambiguous. As the *Schauf* court recognized, insurance law dictates that where an exclusion is ambiguous the narrowest reasonable construction must be applied. *Id.* at 80-81. In *Schauf* that narrow and reasonable interpretation was that the exclusion applied to the "'property on which [the insured] is performing operations,' not to the area in which the insured is performing operations." *Id.* at 81. OSCA argues that when applied to the facts of the instant case the exclusion applies only to 915 feet of casing and a portion of the top platform deck, and not the entire well and entire platform.

AISLIC argues that *Schauf* is an outlier, not followed by other courts and in particular is not a statement of Louisiana law. The parties have agreed that Louisiana law is applicable. AISLIC also points out an internal inconsistency. The contractor in *Schauf* initially argued that the exclusion did not apply because he was cleaning his equipment when the fire started, and as such he was not

performing operations on real property. The court disagreed, finding that the cleaning of the equipment was performing operations because it was performing part of the contract to paint the house and if the equipment was not cleaned it could not later be used to complete the painting. This is odd because the court found that damage to the area where the contractor was cleaning was covered under the policy, only the damage to the kitchen cabinets was excluded.

For its part, AISLIC cites Louisiana jurisprudence. AISLIC relies primarily on a case from Louisiana's Second Circuit involving damage to an oil well. *Goldsberry Operating Co., Inc. v. Cassity, Inc.*, 367 So. 2d 133 (La. Ct. App. 1979). In *Goldsberry* the defendant was hired to perforate ten feet of the well with an explosive gun at a depth of about 8,000 feet. *Id*. at 134. The gun exploded prematurely, at roughly 6,900 feet, causing significant damage to the well. *Id*. The defendant's insurance policy had an exclusion essentially identical to the one at issue. *Id*. After restating the general rule that exclusions are to be construed narrowly the court found that the operations conducted by the defendant were not merely on the ten feet of well it intended to perforate, but instead on the entire length of well that the gun, and the electricity used to detonate it, would have traversed had it reached the intended depth. *Id*. at 134-35. This fact pattern is

49

remarkably similar to the one at issue, and if parallels are drawn, damage to the entire depth of the well intended to be accessed by the coiled tubing and to the parts of the platform actually used by OSCA would be excluded.

The court in *Goldsberry*, and AISLIC, cite as persuasive a case decided by the Supreme Court of Tennessee in which a contractor was hired to install two circuit breakers in an existing electrical switchboard. *Vinsant Elec. Contractors v. Aetna Casualty & Surety Co.*, 530 S.W.2d 76 (Tenn. 1975). While installing the circuit breakers the contractor dropped a wrench and shorted the entire board, which caught fire. *Id*. at 76. Again the relevant insurance policy contained a similar exclusion. *Id*. The court in *Vinsant* made clear that the switchboard was made up of many parts constituting a unit of property within itself. *Id*. at 77. The court held that the exclusion applied to the whole switchboard, not the small area where the circuit breakers were to be installed and commented that to hold otherwise could lead to absurd results. *Id*. This exclusion presents a close call. It appears that both interpretations of the exclusion's language may be reasonable. Louisiana law clearly dictates that where two reasonable interpretations of an exclusion exist the court should choose the one which favors coverage. *McAvey v. Lee*, 260 F.3d 359, 365 (5th Cir. 2001); *See Cochran v. B.J. Services Co. USA,* 302 F.3d 499, 503 (5th Cir. 2002). We, therefore,

50

hold that the D(4) exclusion in the AISLIC policy excludes coverage only to the parts of the platform on which OSCA was actually working.  We therefore reverse the district court's finding that there was no coverage under the D(4) exclusion.

*The E(2) Exclusion*:

Although not discussed by the court below, AISLIC raised in its brief below and raises again here, a second exclusion that it claims applies to preclude recovery. AISLIC notes that this Court can affirm the district court on alternate grounds.[20] Commonly referred to as a "work product exclusion" the section reads:

> E. EFFICACY, LOSS OF USE, ETC.
>    Liability of the insured:
>
>    (1) arising out of the failure of any Insured's Products or of work, including architectural or engineering services, by or on behalf of any Insured to meet any warranty or representation by any Insured as to the level of performance, quality, fitness or durability or extent that such liability is for the diminished value or utility of Insured's Products or work by or on behalf of any Insured;
>    (2) without limiting paragraph (1) of the Exclusion E. in respect of Property Damage to

---

[20] *See Chriceol v. Phillips*, 169 F.3d 313, 315 (5th Cir. 1999)(stating that the Court is not bound by the reasons articulated by the district court for granting summary judgment); *Missouri Pacific R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 538 (5th Cir. 1994)(affirming the district court on grounds raised, but not addressed, below); *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 199 (5th Cir. 1993)(holding that grant of summary judgment may be affirmed on a legal basis not ruled upon below).

51

any Insured's Products or of work, including, without limitation, architectural or engineering services, performed by or on behalf of any Insured, if such Property Damage arises out of any portion of such ... work, or out of materials, parts or equipment furnished in connection therewith.

AISLIC argues that portions of the damages the jury awarded fall within this exclusion, including damages to OSCA's own work and products, as well as consequential damages resulting from its faulty work that are not damages to property of third parties.[21] Specifically, AISLIC argues that the exclusion applies to preclude coverage for OSCA's failure to perform its contractual obligations in a good and workmanlike manner and to consequential damages of the blowout, which it alleges include the control of well and pollution control ($4,771,599.51), relief well expenses ($2,390,783.14), and expenses for restoration and re-drilling of the well ($1,919,520.00).

In support of its contention that the exclusion applies to consequential damages like those listed above, AISLIC cites several Louisiana cases involving building contractors. In the first a contractor was sued for defects in a soybean-storage facility. *Old River Terminal Co-Op v. Davco Corp*., 431 So. 2d 1068 (La. Ct. App.

---

[21] It seems that OSCA admits that the exclusion applies to damages to its own property, and AISLIC admits that the exclusion does not apply to damages to Newfield's platform as that is property of a third party.

1983). The court held that an exclusion nearly identical to E(2) barred coverage for damage to the cracked silos and for consequential damages like fees for consulting engineers and transportation expenses for relocating the soybeans. *Id.* at 1071.

In the second case the owners of an office building sought indemnity from the insurer of a contractor hired to install a window wall system, which among other things leaked. *Rivnor Props. v. Herbert O'Donnell, Inc.*, 633 So. 2d 735 (La. Ct. App. 1994). Again the insurance policy contained language similar to the E(2) exclusion. *Id.* at 751. The court characterized the claim against the contractor as one "based solely on the contractor's defective workmanship, i.e., improper installation of the window wall system." *Id.* The court went on to say, "Louisiana Courts have found no coverage where the liability of a contractor is based solely on improper construction or defective workmanship. This is based on the well-settled principle that liability policies are not intended to serve as performance bonds." *Id.* (citations omitted). The court found that the policy excluded coverage for repairing or replacing the window wall system and further held that the policy also excluded coverage for economic losses, like fees for architects, attorneys and experts and loss of rental income, caused by the insured's defective work. *Id.* at 752.

AISLIC also cites several other cases involving similar

outcomes. In *Hallar Enterprises, Inc. v. Hartman*, the court held that an insurer did not have a duty to defend its insured in a suit for damages, including loss of use, resulting from the failure of a road constructed by the insured. 583 So. 2d 883, 890 (La. Ct. App. 1991). In *Allen v. Lawton & Moore Builders, Inc.*, the court denied coverage for damages, including loss of appreciation, engineering fees, loss of enjoyment, and fees for attorneys and experts, alleged to have resulted from the insured's faulty construction of a house. 535 So. 2d 779 (La. Ct. App. 1988).

OSCA effectively distinguishes these cases by pointing out that in all of them the physical damages excluded were to the work product of the insured and the consequential damages arose from the physical damages to the work product. Stated again, the insured were all contractors hired to construct something essentially from scratch and the thing they constructed (silo, wall, road, house) was the thing physically damaged. Further the consequential damages also excluded by the courts were the direct result of the failed constructions and not the result of damage to some other damaged property. OSCA argues that in this case it was hired to set a bridge plug inside an already constructed well and that its faulty workmanship damaged not only the setting of the bridge plug, its work product, but the property of its employer, the already constructed well and platform. It argues that the consequential

54

damages AISLIC lists were the result of damage to the well and platform, not damage to the bridge plug.

In support of its position OSCA cites a case involving an insured hired to install exterior lighting and outlets for garages on Barksdale Air Force Base. *Hendrix Elec. Co., Inc. v. Cas. Reciprocal Exch.*, 297 So. 2d 470 (La. Ct. App. 1974). The job involved running an underground electrical cable to an existing power distribution panel and installing a new circuit breaker in the panel. *Id.* at 472. An employee accidentally dropped a metal strip and thereby caused a short which started a fire and destroyed the entire panel. *Id.* The court held that the "damage was not to any 'work performed on or on behalf of the named insured.' The damage was to existing property of the Government, that is the panel and attached circuit breakers." *Id.* Thus, the court found that the exclusion clearly did not apply. *Id.*

OSCA also cites *Gardner v. Lackvold*, a case involving the stripping of paint from the exterior of a home. 521 So. 2d 818 (La. Ct. App. 1988). The insured was hired to remove paint from the house in preparation for a new paint job, but neglected to properly clean or neutralize the caustic chemicals used to strip the paint from the house. *Id.* at 819. When a second contractor applied the new paint job, the remaining chemicals ate through it, ruining the finish. *Id.* Again the relevant insurance policy contained similar language to

55

that at issue.  Here the plaintiffs conceded that the insurance would not cover the cost of completing the paint removal the insured was hired to effect.  *Id.* at 819-20. The plaintiffs did, however, seek coverage for the destruction of the new paint job, including the cost of stripping the new paint and the cost of painting the house a second time. *Id.* at 820. The court found for the plaintiffs, agreeing that the exclusion was for damages to "work performed by the named insured" and that here the damage was to other property of the plaintiffs, i.e., the new paint job. *Id.*  The court noted that cases cited by the insurance company, and by AISLIC as discussed above, were distinguishable because they concerned "damages to the actual item constructed or worked on by the contractor rather than damages to other property belonging to the plaintiffs." *Id.*

These cases also appear to coexist peacefully with this Circuit's precedent, based on Louisiana insurance law, in *Todd Shipyards Corp. v. Turbine Service*, Inc., a case involving the repair of a turbine engine. 674 F.2d 401 (5th Cir. 1982). The court answered the question "what is the work product?" where the options were the entire turbine engine or just the specific components being worked on and decided that only the specific components being worked on were the work product. *Id.* at 421. The court held that the exclusion "carves out of the policy damage to the particular work performed by the insured, but not the overall damage that the

56

incorporation of the defective work product causes to the entire entity." *Id.* In addition the *Todd Shipyards* court recognized that while consequential damages arising from damage to work product itself may be excluded, those arising from damage to other property, in this case loss of use of the ship powered by the turbine engine, were not disallowed by the exclusion. *Id.* at 423. AISLIC asserts that *Todd Shipyards* has been supplanted by subsequent Louisiana jurisprudence. We disagree. The cases AISLIC cites, *Allen, Haller Enterprises*, *Rivnor Properties*, and *Old River Terminal Co-op* are discussed and distinguished above. *See also Gaylord Chemical Corp.,* 753 So. 2d 349, 355-56 (La. Ct. App. 2000); *Lauren Plaza Assocs., Inc. v. Gordon H. Kolb Development, Inc.*, 1993 WL 165697 (E.D. La.)(unpublished). We find that the exclusion does not apply to the consequential damages awarded and decline to use this alternate rationale to affirm the district court.

<u>American Home</u>

*Absolute Exclusion II(b)*:

The American Home bumbershoot policy was obtained to provide nine million dollars in excess coverage over OSCA's primary general maritime policy from a now insolvent insurer. The district court held that the American Home policy did not cover OSCA for damages arising from the blowout. The district court applied Absolute Exclusion II(b) which excludes liability arising from:

57

> ownership, use, or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines, gathering stations, and or pipelines, but this exclusion shall not apply to craft serving the foregoing such a crew, supply, or utility boats, tenders or tugs.

The district court found that OSCA's liability arose from its use or operation of Newfield's platform.

American Home centers its legal argument on a case from Louisiana's Fourth Circuit interpreting an identical exclusion. *Janex Oil Co. Inc. v. Hanover Compressor C*o., 694 So. 2d 415 (La. Ct. App. 1997). The court found that the exclusion operated to deny coverage for a negligence claim against St. Bernard Well Service Inc., a company hired to operate a platform located in Lake Catherine, Louisiana. *Id*. at 416. The court held that the language of the exclusion, "arising...from...operation of... drilling rigs..." was unambiguously broader than "operator" which it noted "arguably refers to one individual or entity in overall charge of operations." *Id*. The court noted that the insurance company's argument that the purpose of the exclusion was to limit coverage to vessels while excluding drilling platforms made sense in view of circuit precedent. *Id*. OSCA's attempt to distinguish this case is a little difficult to follow, but it appears that OSCA is arguing that while St. Bernard was hired to operate the entire platform and then accused of doing so negligently, OSCA was only on a platform

58

incident to working on the well and so the *Janex* analysis is inapplicable and the correct question is not whether the liability arose from operation of the platform, but from use of the platform, something not addressed in *Janex*.

OSCA argues that under Louisiana law the use of the excluded object must not only be an essential fact of the accident to trigger the application of an "arising from the use" exclusion, but it must also be an essential element of the plaintiff's theory of liability. In support of this theory OSCA cites a case involving automobile insurance and a kind of drive by shooting. *Edwards v. Horstman*, 687 So. 2d 1007 (La. 1997). In *Edwards* a passenger in one car was shot by a passenger in another car. *Id*. The injured girl sued, among others, the driver of the car in which she was riding and the issuer of his homeowner's insurance. *Id*. at 1010. The insurer argued that coverage was excluded under an "arising out of the use" of a motor vehicle exclusion. The court declared that the provision was "designed to exclude coverage for liability resulting from conduct of an insured that constitutes both a legal cause of injury and a "use" of the vehicle." *Id*. at 1011; *See also Carter v. City Parish Gov't of East Baton Rouge*, 423 So. 2d 1080 (La. 1982)(establishing two-part 'legal cause' and 'use' test and holding that negligent operation of a vehicle by driving into flood waters was both the legal cause of the drowning death of a passenger and use of an

59

automobile).  The court further determined that "in order for conduct to constitute "use" of an automobile, that conduct must be essential to the defendant's liability and the specific duty breached by the insured must flow from the use of the automobile." *Id*. at 1012.  In *Edwards* the court held that the insured's duty did flow from the use of the automobile, having used it to put his passenger in danger instead of avoiding the known gunman in the vehicle ahead.  In another case in which a person was shot while in a motor vehicle, this time by an unknown uninsured motorist, the court found that the injury did not arise from the use of a motor vehicle. *Kessler v. Amica Mutual Ins. Co*., 573 So. 2d 476 (La. 1991).  In *Kessler,* a Tulane law student was driving through an intersection in Uptown New Orleans when an unidentified driver ran a stop sign. *Id.* at 477.  The student swerved to avoid the car and sounded his horn. *Id*. The driver of the other car, probably in response to the horn, fired a shot though the back window of the student's car and into the back of the student's head. *Id*.  The court applied the same analysis used in *Kessler*, but reached a different result, as the conduct of the insured which caused the damage in *Edwards* was reckless driving, where in *Kessler* the conduct relevant for UM coverage was the shooting "while using" a car.  The court drew a distinction between "use" and "while using," found that the car was incidental to the breach of the driver's duty not to

shoot at people, and denied coverage.

OSCA likens its conduct to that of the unidentified shooter, arguing that its use of the platform while working on the oil well was incidental.  It argues that had the well been on land it would have had no use for the platform and its negligence could just as easily have caused a blowout. In OSCA's view the platform was simply a location.  American Home disagrees, arguing that the well and platform are connected, the sole purpose of the platform being to service and operate the attached wells.  Under this theory, the workover operations engaged in by OSCA are within the meaning of the words "use or operation" of a platform.  American Home makes the point that while a gun in a car may be there by happenstance, a platform attached to a well in the middle of the ocean is not.  We agree with American Home, a platform is not a location on which an oil well happens to be, it is there for use in connection with the oil well.  We affirm the district court's finding that American Home is not liable pursuant to this exclusion.  As we find that this absolute exclusion applies and bars recovery, we need not reach the issue of the BUMB-3 pollution endorsement.

## Conclusion:

In sum, we affirm the district court judgment as to the liability issues.  We reverse in part the district court's finding on the insurance issues.  Specifically, we find that the D(4)

61

exclusion to the AISLIC policy is not as broad as it was held to be by the district court. We find that it excludes coverage only for damage to the specific part of the platform and well on which OSCA was working. We remand to the district court for application of this narrower interpretation of the exclusion to the specific coverage afforded by the AISLIC policy. We affirm the district court's judgment as to all of the other insurance issues, with the exception that we did not find it necessary to reach the pollution endorsement issue. AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.